**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| METROPCS, a brand of T-MOBILE USA, Inc., a Delaware Corporation, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| ISAIAH MICHAEL THOMAS, individually and d/b/a GO PHONEZ, ZAMIR JEFFERSON, CHRISTOPHER ALEXANDER T. JOHNSON, BRION R. BENSON, ROLAN STEPHENS, KEOSHA LAWSON, and NINA STEWART, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Miscellaneous Case No. 3:18-mc-00029-K-BN

(Relates to U.S.D.C., Eastern District of Pennsylvania Case No: 2:17-cv-04557-MMB)

**APPENDIX TO METROPCS'S MOTION TO COMPEL DISCOVERY**
**AND RESPONSE IN OPPOSITION TO PETITIONER'S**
**MOTION TO QUASH SUBPOENA AND FOR SUPPLEMENTAL RELIEF [DE 1]**

## __INDEX__

A.  *MetroPCS v. Isaiah Michael Thomas, et al.,*                  Appx. pp.      1—45
    Complaint for Damages and Injunctive Relief
    (*excluding exhibits*)


B.  Declaration of Stacey K. Sutton                  Appx. pp.      46—100


    Exhibit 1 –  Excerpts from the Deposition of Tom Vanderbosch

    Exhibit 2 –  Subpoena *Duces Tecum*

    Exhibit 3 – April 10, 2018 Letter from Gary N. Schepps
                    to MetroPCS Counsel

    Exhibit 4 – April 16, 2018 Letter from Stacey K. Sutton
                    to Gary N. Schepps

    Exhibit 5 – April 18, 2018 E-mail from Gary N. Schepps
                    to MetroPCS Counsel

# A.  *MetroPCS v. Isaiah Michael Thomas, et al.,* Complaint for Damages and Injunctive Relief

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| METROPCS, a brand of T-MOBILE USA, Inc., a Delaware Corporation,<br><br>  Plaintiff,<br><br>v.<br><br>ISAIAH MICHAEL THOMAS, individually and d/b/a GO PHONEZ, ZAMIR JEFFERSON, CHRISTOPHER ALEXANDER T. JOHNSON, BRION R. BENSON, ROLAN STEPHENS, KEOSHA LAWSON, and NINA STEWART,<br><br>  Defendants. | Civil Action No: _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff T-Mobile USA, Inc., a Delaware corporation ("T-Mobile"), for itself and its MetroPCS brand (collectively referred to hereafter as "MetroPCS"), hereby files this Complaint for Damages and Injunctive Relief against Defendants Isaiah Michael Thomas, individually, and d/b/a Go Phonez, Zamir Jefferson, Christopher Alexander T. Johnson, Brion R. Benson, Rolan Stephens, Keosha Lawson, and Nina Stewart (collectively, "Defendants"), and states:

### INTRODUCTION

1. T-Mobile sells wireless handsets under the brand MetroPCS ("MetroPCS Handsets" or "Handsets") for use with MetroPCS service on the T-Mobile wireless network. These MetroPCS Handsets are sold at prices significantly below the wholesale cost to MetroPCS so that the Handsets are more widely accessible to consumers. Defendants and their co-conspirators are perpetrators of an unlawful scheme (the "Handset Theft and Trafficking Scheme" or the "Scheme") to profit, at Plaintiff's expense, from the illegal acquisition and resale

of new MetroPCS Handsets by stealing the substantial financial investments that Plaintiff makes in the Handsets.

2.      Defendants and their co-conspirators acquire new MetroPCS Handsets through various methods, including the use of "runners" and/or "mules."[1]  As part of Defendants' Scheme, the new Handsets, which may be purchased and sold multiple times before they are ever used, ultimately end up in the hands of someone other than a MetroPCS customer.  Along the way, the Handsets are "unlocked" so they will operate on other wireless networks, either domestic or overseas.

3.      Defendants' Scheme takes advantage of the fact that while Plaintiff substantially invests in the Handsets to reduce the costs for legitimate MetroPCS consumers, other wireless service providers here or abroad do not.  By obtaining the MetroPCS Handsets through theft or fraud and diverting them to other markets where cell phones are not subsidized, the Scheme converts Plaintiff's investment dollars into profits for Defendants and their co-conspirators. Each of Defendants' acts, individually as well as together, is a violation of Plaintiff's rights and causes significant damage.  Additionally, as participants in the conspiracy, Defendants are liable for the harm caused to Plaintiff by the entire Scheme.

4.      The Scheme causes tremendous harm to MetroPCS and to consumers.   In addition to the pecuniary losses caused by Defendants' theft of Plaintiff's investment in MetroPCS Handsets, falsely paid commissions, lost sales and market expenses, and lost expected customer revenue, Defendants' misconduct harms MetroPCS's relationships with its customers, dealers, and others, as detailed more fully below.  Defendants' Scheme also involves unlawfully accessing Plaintiff's protected computer systems and wireless network; trafficking of Plaintiff's

---

[1] A "runner" is an individual or entity that makes multiple purchases of new MetroPCS Handsets on behalf of phone traffickers like Defendants.  A "mule" is an individual or entity that signs up for wireless service with MetroPCS – never intending to comply with the terms and conditions – to obtain new subsidized MetroPCS Handsets for resale by phone traffickers like Defendants.

2

112803843.1

protected and confidential computer passwords; and willful infringement of the MetroPCS trademarks. Defendants have caused substantial damage to MetroPCS's brand, image, and reputation.

5.    Plaintiff seeks to recover damages for the harm caused by Defendants' Handset Theft and Trafficking Scheme, and to obtain an injunction prohibiting Defendants from continuing to perpetrate the Scheme.

6.    All conditions precedent to filing this action have been performed, waived or excused.

7.    Plaintiff has retained the undersigned attorneys to represent them in this action and have agreed to pay those attorneys a reasonable fee for their services.

## PARTIES, JURISDICTION, AND VENUE

8.    This is an action for damages in excess of $75,000.00, exclusive of interest, costs, and attorneys' fees.

9.    T-Mobile is a Delaware corporation, with its principal place of business in Bellevue, Washington.

10.    MetroPCS was acquired by T-Mobile USA, Inc. in 2013 and is an exclusive T-Mobile brand.

11.    Defendant Isaiah Michael Thomas individually and d/b/a Go Phonez ("Thomas") is an individual and a resident of Philadelphia, Pennsylvania and upon information and belief is personally engaged in, and helped facilitate, the improper conduct described herein.  Upon information and belief, Thomas resides on Sprague Street, Philadelphia, Pennsylvania 19119.

12.    Defendant Zamir Jefferson ("Jefferson") is an individual and a resident of West Chester, Pennsylvania and upon information and belief is personally engaged in and helped

3

112803843.1

004

facilitate the improper conduct described herein. Upon information and belief, Jefferson resides on Waterview Road in West Chester, Pennsylvania 19380.

13.     Defendant Christopher Alexander T. Johnson ("Johnson") is an individual and a resident of Philadelphia, Pennsylvania and upon information and belief is personally engaged in, and helped facilitate, the improper conduct described herein. Upon information and belief, Johnson resides on West Zeralda Street in Philadelphia, Pennsylvania 19144.

14.     Defendant Brion R. Benson ("Benson") is an individual and a resident of Camden, New Jersey and upon information and belief is personally engaged in and helped facilitate the improper conduct described herein. Upon information and belief, Benson resides on Magnolia Avenue in Camden, New Jersey 08103.

15.     Defendant Rolan Stephens ("Stephens") is an individual and a resident of Philadelphia, Pennsylvania and upon information and belief is personally engaged in, and helped facilitate, the improper conduct described herein. Upon information and belief, Stephens resides on West Venango Street in Philadelphia, Pennsylvania 19140.

16.     Defendant Keosha Lawson ("Lawson") is an individual and a resident of Philadelphia, Pennsylvania and upon information and belief is personally engaged in, and helped facilitate, the improper conduct described herein. Upon information and belief, Lawson resides on Sprague Street in Philadelphia, Pennsylvania 19119.

17.     Defendant Nina Stewart ("Stewart") is an individual and a resident of Columbia, South Carolina and upon information and belief is personally engaged in, and helped facilitate, the improper conduct described herein. Upon information and belief, Stewart resides on Blossom Street in Columbia, South Carolina 29205.

18.     Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331, 1332, and 1338 because Plaintiff's claims for violation of the United States Trademark Act, Title 15 of the

112803843.1

United States Code and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* arise under federal law and because diversity exists between the parties and the amount in controversy exceeds $75,000.00 exclusive of costs, fees, and interest. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state law claims because those claims are so related to the federal claims that they form part of the same case or controversy.

19.    Defendants Thomas, Jefferson, Johnson, Benson, Stephens, Lawson, and Stewart are subject to the personal jurisdiction of this Court because they are residents of the Commonwealth of Pennsylvania or because they have conducted, engaged in, and carried out business ventures within the Commonwealth of Pennsylvania, including trafficking new MetroPCS Handsets, or have committed tortious acts within the Commonwealth of Pennsylvania, and have engaged in substantial and not isolated activity within the Commonwealth of Pennsylvania.

20.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because the Defendants either reside in this district and/or a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## PLAINTIFF'S BUSINESS MODEL

21.    T-Mobile, which is based in Bellevue, Washington, is a well-established telecommunications leader in product and service innovation. T-Mobile has invested heavily in developing and maintaining its reputation and the reputation of its brands, including MetroPCS. It prides itself on its advanced nationwide 4G LTE network and low cost options provided for its customers. T-Mobile USA, Inc. provides services through its subsidiaries and operates its flagship brands, T-Mobile and MetroPCS. It currently serves approximately 69 million wireless customers and provides products and services through approximately 70,000 total points of distribution.

5

112803843.1

22.    MetroPCS, acquired by T-Mobile on May 1, 2013, has been in the forefront of telecommunications for decades by offering customers reduced-cost handsets and flat-rate wireless service plans.  MetroPCS prides itself on the value and variety of device choices from leading brands provided to its customers.  The cornerstone of MetroPCS's business model is providing customers with affordable, reliable wireless products and services to match their needs and lifestyles.  A flagship brand operated by T-Mobile, MetroPCS products and services are available online and across the United States through a network of company-owned stores and authorized dealer locations, with whom MetroPCS has contractual relationships.

23.    T-Mobile and MetroPCS are widely-recognized leaders in prepaid wireless service and highly value the outstanding business reputation they have worked hard to develop. MetroPCS has been recognized as a J.D. Power Customer Champion for delivering service excellence after being evaluated across five categories including its people, presentation, process, product and price and T-Mobile again achieved the highest ranking in customer service in J.D. Power's 2015 Wireless Customer Care Full-Service Study for the 13th time.

24.    MetroPCS's wireless program enables MetroPCS customers to choose from several flat-fee monthly voice and data plans for use with cutting edge devices on the T-Mobile wireless network.  For the benefit of its customers, MetroPCS offers budget-friendly Handsets, including the latest smartphones, for little or no upfront cost, no annual service contract, no overages, and no hidden device costs.

25.    MetroPCS's business model is based upon the ability to deliver affordable, innovative, and desirable products and services to cost-conscious consumers.  Therefore, Plaintiff assists customers in their purchase of MetroPCS Handsets for use on its network by selling the Handsets for less than what Plaintiff pays to the manufacturers for the Handsets. Plaintiff recoups the money it loses on the Handsets and in dealer commissions through revenue

earned on the sale of MetroPCS service, which customers must use to transmit and receive voice, text, and data on the MetroPCS Handsets.  In addition to subsidizing Handsets, MetroPCS provides discounts, rebates, and other incentive programs by which Plaintiff heavily invests in the Handsets to the ultimate benefit of legitimate MetroPCS customers.  This investment is worth making if the customers pay for service on the MetroPCS network in accordance with the governing Terms and Conditions.  MetroPCS is neither a manufacturer nor a wholesale distributor of Handsets.  If MetroPCS was in the business of selling Handsets, and not a telecommunications service provider, it could not offer consumers these significantly lower purchase prices and stay in business.  Further, these types of substantial subsidies and investment programs are not offered by telecommunications carriers outside the United States.  Instead, foreign consumers pay full price for the phones from the manufacturers.  Handset traffickers profit from the difference between the full value of the Handset and the subsidized price offered by MetroPCS.

26.    MetroPCS Handsets are sold subject to terms and conditions ("Terms and Conditions") which restrict and limit the commercial resale and use of the Handsets.  A copy of the Terms and Conditions is attached hereto as **Exhibit A**.  The packaging of MetroPCS Handsets provides that by purchasing or opening the package, activating, using, or paying for MetroPCS service, the purchaser agrees to the MetroPCS Terms and Conditions posted on www.metropcs.com.  Purchasers have the option to return the MetroPCS Handset in accordance with the return policy if they do not agree to the Terms and Conditions.  The Terms and Conditions are legally valid and appropriate, and the Terms and Conditions constitute a valid and binding contract between MetroPCS and each of its customers.

27.    MetroPCS is able to offer its Handsets to customers at reduced prices only if the Handsets are used as intended with MetroPCS service.  Manufacturers that produce wireless

7

112803843.1

008

phones for MetroPCS install proprietary software, requested and paid for by Plaintiff, on the MetroPCS Handsets. Among other things, this software is intended to prevent the Handsets from being used for other than MetroPCS service, except under circumstance in which legitimate customers meet the criteria to have the Handset unlocked.

28.    Wireless technology is constantly changing and improving, and the wireless industry is intensely competitive. MetroPCS expends substantial resources to maintain its position as an industry leader and to ensure that its products and services are at the cutting edge of the latest technological developments. Providing its cost-conscious customers with quality and advanced technology at an affordable price is a key differentiator for MetroPCS and central to its business strategy.

29.    Plaintiff invests heavily in efforts to provide MetroPCS customers with the most up-to-date wireless handsets, and shoulders most or all of the cost of purchasing a new phone for those customers. MetroPCS makes phones available to new customers at a low cost when they initiate wireless service, and also to existing customers at regular intervals.

30.    As the demand, and therefore the price, for smartphones in various world markets skyrocket, the subsidized MetroPCS smartphones are a particularly attractive and lucrative target for participants in the Handset Theft and Trafficking Scheme.

### METROPCS TRADEMARK RIGHTS

31.    T-Mobile owns federal trademark registrations for the standard character and stylized MetroPCS® mark (collectively, the "MetroPCS Marks"). Copies of the certificates of registration issued by the United States Patent and Trademark Office ("USPTO") are attached hereto as **Composite Exhibit B**.[2] The stylized MetroPCS Marks are depicted below:

---

[2] On or around November 3, 2006, MetroPCS, Inc. assigned all of its MetroPCS Marks to MetroPCS Wireless, Inc. as part of a merger agreement. The assignment was recorded with the USPTO on April 3, 2007. On or around May

8

**metro**PCS.          **metro**PCS.

32.     Plaintiff uses the MetroPCS Marks on and in connection with telecommunications products and services.

33.     The MetroPCS Marks have become an intrinsic and essential part of the valuable goodwill and property of Plaintiff, who protects the MetroPCS Marks. The MetroPCS Marks are well-established and well-known to customers and the trade as a symbol identifying and distinguishing MetroPCS products and services, and signifying distinctive products and services of high quality. Only Plaintiff and its expressly authorized, affiliated agents are permitted to use the MetroPCS Marks. The MetroPCS Marks are valid, distinctive, protectable, have acquired secondary meaning, and are associated exclusively with Plaintiff and MetroPCS.

### DEFENDANTS' MISCONDUCT

34.     MetroPCS has discovered that, although large quantities of its Handsets are being acquired throughout the United States, a significant number of these Handsets are not being used in connection with its services. Instead, entities and individuals such as Defendants and their co-conspirators, with no intention of lawfully connecting to or using MetroPCS services, are fraudulently acquiring and reselling MetroPCS Handsets in bulk quantities. The Handsets are acquired, either directly by Defendants or through their co-conspirators, and then sold for a substantial profit and shipped directly overseas or shipped to other domestic traffickers who add them to larger shipments headed overseas, to be used on foreign carriers' networks. Before being shipped overseas, the Handsets are usually taken out of their original packaging, and all accessories, warranties, and manuals are removed. The Handsets are often wrongfully

---

1, 2013, MetroPCS Wireless, Inc. assigned all of its MetroPCS Marks to T-Mobile USA, Inc. as part of a merger agreement. The assignment was recorded with the USPTO on May 2, 2013.

112803843.1

unlocked by Defendants or their co-conspirators, to raise their value and prepare them for use on foreign carriers. Those new MetroPCS Handsets acquired through theft or fraud that are not shipped overseas are often sold in bulk domestically for inclusion in larger overseas shipments or for the warranty market. Defendants undertake these actions for their own profit.

35.     Once a MetroPCS Handset is unlocked and shipped overseas or resold domestically to be used on other wireless networks, Plaintiff no longer has a revenue source to recoup its investment in that Handset.

36.     If MetroPCS identifies a Handset as connected with theft, fraud, or other loss, the International Mobile Station Equipment Identity ("IMEI") is logged into MetroPCS's system and the Handset can no longer be activated or used on the MetroPCS network unless or until that designation is changed by MetroPCS. This is done in attempt to deter criminal activity. The Handset is thereafter referred to in the handset trafficking community as having a "Bad IMEI." As it is no longer a functioning MetroPCS Handset, the only value of a Bad IMEI Handset is in unlocking the handset for use on other domestic networks and for overseas resale.

37.     Defendants are knowingly and willfully engaged in an enterprise that traffics in and resells MetroPCS Handsets. Defendants have acquired and sold large quantities of MetroPCS Handsets through various co-conspirators. While the complete extent of Defendants' activities in the Handset Theft and Trafficking Scheme is not yet known, Defendants are actively involved in several integral components of the conspiracy.

38.     Defendants are not authorized MetroPCS dealers. Defendants have no legitimate connection to MetroPCS.

39.     MetroPCS identified Defendants as handset traffickers in or around August 2016 through Facebook advertisements selling new MetroPCS Handsets. A sample of the Facebook ads are attached as **Composite Exhibit C**. For example, one advertisements reads: "Brand New

10

112803843.1

011

Metro Pcs Smart Phones Under T Mobile Towers … Inbox me now and get yo plan,cuz im ya neighborhood metro man." [*sic*]. *See* Exhibit C.

40.     MetroPCS learned that from January 2016 to July 2016, Defendant Thomas worked for a MetroPCS authorized dealer named Unlimited Wireless in Philadelphia, which is where he was trained on MetroPCS's procedures for, among other things, account and handset activations, porting numbers, and ESN swaps.   During Defendant Thomas' employment at Unlimited Wireless, he devised and implemented a scam to take advantage of the port-in promotion that MetroPCS offers to attract new customers with a free phone.

41.     In this particular promotion, MetroPCS seeks to attract new customers by offering a free handset to anyone who ports-in their number from another carrier.   In Thomas' scam, if a current MetroPCS customer wanted a new phone but was not eligible for an upgrade, he would direct the person to a nearby discount store to buy an inexpensive Tracfone and advise them to activate the Tracfone by loading it with the minimum amount of airtime, for a nominal cost.   The individual would then return to Unlimited Wireless where Thomas would port-in the newly-activated Tracfone number to MetroPCS, thus appearing to be a legitimate new activation on MetroPCS, and the individual would be entitled to a new phone under MetroPCS's promotion.

42.     At one time, the promotion was offering two new phones with a single port-in. The individual would then have fraudulently obtained at least one, if not two, new Handsets that she could illegally unlock and use on any carrier, which deprives MetroPCS of the opportunity to recoup the cost of the Handset and earn profit from the individual purchasing MetroPCS service. Even if the customer remains on MetroPCS, the promotion is being abused because the customers are fraudulently obtaining upgrade phones that they are not entitled to because they have not been MetroPCS account holders for the requisite period of time to have earned an upgrade.

112803843.1

012

43.    Defendant Thomas admits that he knew his scam was losing money for MetroPCS, but he continued to do it anyway because it increased his sales, which looked good to his manager.  Thomas acknowledged that he was assisting customers to commit fraud.

44.    After being terminated from the MetroPCS dealer, Thomas began using the scam he devised for personal profit.  Thomas would buy inexpensive Tracfones and port the numbers over to MetroPCS in order to obtain free MetroPCS Handsets, that he then resold in bulk.

45.    On August 31, 2016, an undercover investigator contacted Defendant Thomas via Facebook to inquire about purchasing a Handset.  Thomas indicated that all of his phones are new and sent the investigator a photo of his business card for "Go Phonez," where he fraudulently holds himself out as an "Authorized Dealer."  A copy of Thomas' business card is attached as **Exhibit D**.

46.    On September 1, 2016, Thomas met the investigator and sold him a new MetroPCS LG K7.  Following the transaction, Thomas texted the investigator confirming that "[a]ll of my phones are under the metro network," and provided photos of his inventory.  A copy of the text messages is attached as **Exhibit E**.

47.    On September 16, 2016, Thomas met the investigator again to further discuss his business.  Thomas indicated that he could obtain Handsets in bulk and was not concerned if they were ultimately shipped out of the country.

48.    MetroPCS researched the IMEI of the Handset purchased from Defendants and learned that the Handset had originated from a MetroPCS dealer, and was one of multiple activations on the same account, all of which is consistent with a Handset that was obtained through Defendants' scam.

013

49.     As a result of Defendant Thomas' fraudulent activities, MetroPCS served him with a cease and desist letter on or about October 19, 2016. A copy of the cease and desist letter is attached as **Exhibit F**.

50.     After Thomas was identified as a fraudster, served with the cease and desist letter, and was being turned away from MetroPCS stores, Thomas recruited his friends and family members, including the co-Defendants, as runners to continue to obtain a steady supply of new MetroPCS handsets and to advertise and sell the Handsets online, for which they each used their personal Facebook accounts.

51.     For example, Defendant Jefferson, Thomas' half-brother, advertised on Facebook new, unlocked Samsung Galaxy 5 handsets, pictured altered and outside of the original packaging. A sample of Defendant Jefferson's advertisements are attached as **Exhibit G**. Defendant Jefferson has been arrested twice under charges of making terroristic threats with the intent to terrorize another, and several additional arrests under charges including burglary and criminal trespass.

52.     Defendant Stephens advertises new, unlocked Samsung Galaxy 5 handsets and Sim cards with unlimited talk, text, and data on Facebook, and once again, the products are pictured altered and outside of the original packaging. A sample of Defendant Stephens' advertisements are attached as **Exhibit H**.

53.     Defendant Benson advertises new MetroPCS handsets for sale with unlimited talk, text, and data. A sample of Defendant Benson's advertisements are attached as **Exhibit I**. The photos that Defendant Benson posts on Facebook confirm that the Handsets are also altered by being removed from their original packaging prior to resale. *Id.* Moreover, Defendant Benson offers personal delivery service of Handsets to Philadelphia buyers for a nominal fee. *Id.*

112803843.1

014

54.    Defendant Johnson advertises new MetroPCS LG K20 Handsets with a "free" month of service as well as new, unlocked Samsung Galaxy 5 Handsets.  A sample of Defendant Johnson's advertisements are attached as **Exhibit J**.  Once again, the photos confirm that the Handsets and accessories are removed from their original packaging prior to being advertised and resold in altered form.  *Id.*

55.    Defendant Stewart, Thomas' mother, also posts Facebook ads "looking to buy MetroPCS iPhones."  A sample of Defendant Stewart's advertisements are attached as **Exhibit K**.  Stewart also advertised to sell new MetroPCS Samsung Galaxy and LG K20 Handsets for sale on Facebook, all of which are pictured out of box, some of which were specifically identified as being unlocked.  *Id.*  Moreover, the ads also state that the phones work "overseas," which is another reference to the phones being unlocked and capable of export for use on international carriers.  *Id.*

56.    On or about September 6, 2017, MetroPCS served Defendant Stewart with a cease and desist letter for her participation in the Scheme.  A copy of the cease and desist letter is attached as **Exhibit L**.  Undeterred by the cease and desist demand, Defendant Stewart continued to post advertisements after being served.  A sample of advertisements on Defendant Stewart's Facebook page after being served with the cease and desist demand is attached as **Exhibit M**.

57.    Defendant Lawson, Thomas' girlfriend, also posted advertisements on her Facebook page to sell MetroPCS Handsets.  A sample of Defendant Lawson's advertisements are attached as **Exhibit N**.  For example, the ads specify METROPCS SAMSUNG GALAXY 5 … ALMOST SOLD OUT!!!" and "Brand new Metro Pcs Smart Phones."  *Id.*  As with all of the Defendants' advertisements, these phones too are pictured altered and outside of the original packaging.  *Id.*

112803843.1

015

58.     As a result of Lawson's participation in the Scheme, MetroPCS served her a cease and desist letter on or about January 19, 2017.  A copy of the cease and desist letter is attached as **Exhibit O**.

59.     Facebook eventually banned Thomas from Marketplace but he recently posted a new add selling at least 21 brand new MetroPCS Handsets.  A copy of the October 9, 2017, posting is attached as **Exhibit P**.  In addition to Facebook, Defendants use online markets such as LetGo and 5Mile to advertise MetroPCS Handsets for sale.

60.     Defendants admit that they are aware that not all of their customers are end users of the MetroPCS Handsets but instead are aggregators—collecting new MetroPCS Handsets for overseas resale.

61.     Thomas testified under oath that he obtains approximately 80 new MetroPCS Handsets per week and resells seven to ten  of the new phones per day.  Upon information and belief, this was Thomas' sales data prior to going into business with the co-defendants, and that since he recruited Jefferson, Johnson, Benson, Stephens, Lawson, and Stewart, the business has vastly expanded.

62.     On information and belief, Defendants have continued their scam and are fraudulently obtaining a minimum of 80 new MetroPCS Handset per week and reselling at least seven new MetroPCS Handsets per day since their Scheme began in or about August 2016, all of which are removed from their original packaging, unlocked and either resold domestically for use on networks other than MetroPCS, or shipped overseas by Defendants or their co-conspirators for their own profit and to MetroPCS's detriment.

### SUBSTANTIAL HARM CAUSED BY DEFENDANTS' MISCONDUCT

63.     Defendants' actions substantially harm Plaintiff in several ways, including *inter alia*: (1) Plaintiff is deprived of the opportunity to recoup its substantial investment in MetroPCS

Handsets; (2) Plaintiff is deprived of the opportunity to earn profits by providing wireless service to legitimate MetroPCS consumers; (3) Defendants' actions seriously and irreparably interfere with Plaintiff's relationships with its customers and dealers; and (4) Defendants' infringement of the MetroPCS name and Marks causes significant ongoing and irreparable losses and harm to MetroPCS's brand, image, and reputation. All of these factors undermine Plaintiff's competitive edge in the wireless industry.

64.    On information and belief, the conduct of Defendants, their known and unknown co-conspirators, and others who engage in the unlawful acquisition and resale of large quantities of new MetroPCS Handsets has also resulted in shortages of available MetroPCS Handsets, particularly the most in-demand models. This misconduct substantially harms Plaintiff and its relationship with dealers and consumers because Plaintiff is not able to supply sufficient MetroPCS Handsets to satisfy the demand from legitimate consumers who, as a result, go elsewhere for their telecommunications services.

65.    Plaintiff suffers additional, irreparable harm when the MetroPCS Handsets are removed from the original packaging and altered because Plaintiff is deprived of the means to control the quality of its product. This becomes especially damaging where a potential legitimate MetroPCS customer within the United States acquires a Handset from Defendants that the customer believes is a genuine MetroPCS Handset, with all of the attendant benefits and is later disappointed in MetroPCS because the Handset does not work as intended on the network because it has been denominated a Bad IMEI Handset or otherwise. Furthermore, the process of unlocking and reselling a MetroPCS Handset voids the manufacturer's warranty on the device. The unlocked, repackaged MetroPCS Handsets are then resold without the original manufacturer's warranty documentation. Both consumers and Plaintiff are harmed when a MetroPCS Handset that has been altered or sold by Defendants or their co-conspirators is

16

submitted for warranty repair. Consumers who purchase MetroPCS Handsets from Defendants or their co-conspirators are unable to obtain warranty service in the event they experience problems with their Handsets. As a result, the MetroPCS reputation suffers .

66.    MetroPCS's reputation is further damaged by its inability to assist those consumers who buy MetroPCS Handsets from Defendants, because despite bearing the MetroPCS Mark, they are no longer valid MetroPCS Handsets because the actions of Defendants and their co-conspirators voided the warranties and/or as identified Bad IMEI phones, they cannot be activated on MetroPCS service.

67.    Defendants' conduct has resulted in substantial harm to Plaintiff's business reputation and goodwill; a greater likelihood of confusion, mistake, and deception as to the source of origin of MetroPCS products unlawfully sold by the Defendants; and confusion as to what, if any, relationship exists between Plaintiff and Defendants.

### CIVIL LITIGATION AGAINST OTHER PHONE TRAFFICKERS

68.    Federal courts have recognized that conduct similar to Defendants' conduct is unlawful.

69.    In addition to MetroPCS and T-Mobile USA, Inc., Sprint Solutions, Inc. and Sprint Communications Company L.P. ("Sprint), TracFone Wireless, Inc., Nokia Corporation, and AT&T Mobility LLC have all filed lawsuits in numerous federal courts across the country against handset traffickers engaged in the practice of defrauding legitimate consumers and the telecommunications companies by acquiring large quantities of wireless telephones and reselling them for profit. Each of those companies has succeeded in obtaining Final Judgments and Permanent Injunctions. Copies of several examples of Final Judgments and Permanent Injunctions are attached hereto as **Composite Exhibit Q**. A defendant in one case who continued trafficking phones in violation of an injunction issued by the U.S. District Court for

17

the Southern District of Texas was charged with criminal contempt of court and sentenced to serve 57 months in prison. Copies of the Memorandum Opinion and Order of Contempt, Application for Criminal Contempt, the Order finding cause to believe the defendant is guilty of criminal contempt, and Judgment of Criminal Contempt are attached hereto as **Composite Exhibit R**.

**CRIMINAL INVESTIGATION AND
PROSECUTION OF PHONE TRAFFICKING**

70.     Handset traffickers like Defendants have been the subject of numerous criminal investigations and prosecutions across the country. Some recent examples are:

a.     In August 2014, the United States Attorney for the District of Minnesota announced the indictment of 20 individuals engaged in the illegal acquisition and resale of tens of thousands of Smartphones to the black markets of the Middle East and China. A joint task force comprised of the U.S. Secret Service, the Minnesota Financial Crimes Task Force, and the St. Paul Police Department investigated and then apprehended members of the "Mustafa Organization," who had been using runners, engaged in contract and subscription fraud, and robbery to acquire large quantities of subsidized phones for overseas resale.

b.     In March 2013, the California Attorney General charged two individuals with trafficking nearly $4 million in wireless phones to Hong Kong over an 8 month period.

c.     On or about February 25, 2013, federal law enforcement authorities, including agents from the Federal Bureau of Investigation, the United States Secret Service, and the Bureau of Alcohol, Tobacco, Firearms and Explosives, raided a warehouse belonging to a phone trafficking company called Wireless Buybacks in

Elkridge, Maryland, pursuant to a search warrant and found the facilities were being used to harbor stolen wireless phones.

d.    On August 21, 2012, federal Homeland Security agents and SWAT teams conducted a raid on facilities operated by handset trafficker Ace Wholesale and on the home of the company's CEO, Jason Floarea. On October 16, 2014, Mr. Floarea pled guilty to Interstate Transportation of Stolen Property and on April 16, 2015, Floarea was sentenced to twelve (12) months and one day in federal prison.

e.    An FBI sting operation in Philadelphia that began with wireless phone trafficking resulted in the conviction of 16 individuals on terrorism charges, when it turned out that the proceeds from their phone trafficking and other illegal conduct was being funneled to the terrorist organization Hezbollah.

Copies of court documents, press releases, and news reports regarding these incidents are attached hereto as **Composite Exhibit S**.

<u>**COUNT ONE**</u>

**UNFAIR COMPETITION**

71.    Plaintiff reasserts the allegations set forth in Paragraphs 1 through 67 above as though fully set forth herein.

72.    Defendants' conduct in acquiring and/or inducing others to acquire the Handsets, disabling or unlocking, inducing others to disable or unlock, and/or assisting others to disable or unlock the Handsets, and reselling and/or assisting others to resell the Handsets as new for activation on other wireless networks constitutes unfair competition under the common law of the Commonwealth of Pennsylvania.

19

112803843.1

73.    Defendants' conduct in selling, inducing others to sell, and/or conspiring with others to sell unlocked MetroPCS Handsets undermines Plaintiff's incentive programs, illegally appropriates Plaintiff's investment in the Handsets, and constitutes unfair competition under the common law of the Commonwealth of Pennsylvania.

74.    Defendants' use of at least one of the MetroPCS Marks in connection with the sale of unlocked, materially-different MetroPCS Handsets has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' materially-different products and services, and the relationship between MetroPCS and Defendants.    Thus, Defendants have also engaged in unfair competition with Plaintiff in violation of the common law of the Commonwealth of Pennsylvania by selling and/or offering, and promoting their products with the intention of trading upon the goodwill established by MetroPCS and are thereby misappropriating the benefits of substantial effort and money expended by Plaintiff in establishing its rights in and to the MetroPCS Mark.

75.    Defendants' actions were done in bad faith; they were intentional, malicious, and willful, and have caused substantial harm to Plaintiff.

76.    Plaintiff is entitled to appropriate relief, including injunctive relief.

## COUNT TWO

### TORTIOUS INTERFERENCE WITH
### EXISTING AND PROSPECTIVE BUSINESS RELATIONSHIPS AND CONTRACTS

77.    Plaintiff reasserts the allegations set forth in Paragraphs 1 through 67 above as though fully set forth herein.

78.    A business relationship, and an expectancy of business relationships, exists between Plaintiff and authorized dealers of MetroPCS Handsets.

20

79.     A business relationship, and an expectancy of business relationships, exists between Plaintiff and current and prospective MetroPCS customers.

80.     A contractual relationship, and an expectancy of a contractual relationship, for a specific term exists between Plaintiff and authorized dealers of MetroPCS Handsets and prospective authorized dealers of MetroPCS Handsets.

81.     A contractual relationship, and an expectancy of a contractual relationship, exists between MetroPCS and its customers and prospective customers, the purchasers of its MetroPCS Handsets and wireless service.

82.     There is a reasonable likelihood that these prospective business relationships and contracts would occur but for the unjustified interference of Defendants and/or their co-conspirators.

83.     There is a high probability of future economic benefit to MetroPCS as a result of these current and prospective business relationships and contracts.

84.     Defendants have knowledge of and have intentionally and unjustifiably interfered with, and/or have knowingly facilitated a conspiracy to interfere with, these current and prospective business relationships between Plaintiff and authorized dealers who sell MetroPCS products, and legitimate MetroPCS customers or prospective customers.

85.     Specifically, but without limitation, Defendants knew that Plaintiff has business relationships, and an expectancy of business relationships, with legitimate consumers of MetroPCS Handsets and wireless service.  Defendants interfered with these relationships by engaging in the Handset Theft and Trafficking Scheme and causing, at least in part, Plaintiff to have an insufficient supply of MetroPCS Handsets available to meet legitimate consumer demand.

21

86.     Defendants also knew that Plaintiff has business relationships with authorized dealers of MetroPCS Handsets to provide the dealers with sufficient quantities of MetroPCS Handsets for their legitimate consumers' use exclusively on MetroPCS's wireless network. Defendants' Scheme has resulted in a substantial number of MetroPCS Handsets that are never activated on MetroPCS service and has further caused shortages of available MetroPCS Handsets, thereby substantially harming Plaintiff and its relationship with its authorized dealers because Plaintiff is unable to supply dealers with sufficient Handsets to satisfy the demands from legitimate consumers.

87.     Additionally, but without limitation, Defendants knew that Plaintiff has contractual relationships with legitimate consumers of MetroPCS Handsets and wireless service. Defendants interfered with these relationships by, *inter alia*, inducing runners and credit mules or other purchasers of MetroPCS products to breach their contracts with Plaintiff.

88.     Defendants also knew that Plaintiff has contractual relationships with authorized dealers of MetroPCS Handsets under which these dealers will promote and sell MetroPCS products solely for activation on the MetroPCS wireless network.   On information and belief, Defendants and/or their co-conspirators induce authorized MetroPCS dealers to breach their agreements with Plaintiff and provide new MetroPCS Handsets to Defendants for a purpose other than activation on the MetroPCS wireless network and at a financial loss to Plaintiff.

89.     Defendants also knew that Plaintiff has business relationships with legitimate MetroPCS customers to provide them with Handsets and service on the MetroPCS wireless network.

90.     Defendants are intentionally interfering with Plaintiff's business relationships and prospective advantages through improper means and in violation of the law.

112803843.1

023

91.     Defendants engaged in the acts of interference set forth herein with a conscious desire to induce breach of contract, or Defendants knew that breach of contract was certain or substantially certain to occur as a result of their conduct.

92.     Defendants have knowledge of and have intentionally and unjustifiably interfered with, and/or have knowingly facilitated a conspiracy to interfere with, these business relationships and contracts between Plaintiff and its authorized dealers and legitimate MetroPCS customers

93.     Defendants' acts injured Plaintiff's business relationships and contractual relationships.

94.     Plaintiff has been proximately damaged and continues to be damaged as a result of Defendants' interference.

95.     There is no adequate remedy at law to fully compensate Plaintiff for the harm caused by Defendants' tortious interference.

## COUNT THREE

### CONSPIRACY TO COMMIT FRAUD
### AND FRAUDULENT MISREPRESENTATION

96.     Plaintiff reasserts the allegations set forth in Paragraphs 1 through 67 above and Paragraphs 105 through 112 below as though fully set forth herein.

97.     An agreement and conspiracy existed and continues to exist between and among the Defendants and their co-conspirators to unlawfully acquire in bulk, traffic, and resell unlawfully unlocked and materially altered MetroPCS Handsets under at least one of the MetroPCS Marks, which results in federal common law and statutory trademark infringement, common law unfair competition, contributory trademark infringement, tortious interference with

112803843.1

024

existing and prospective business relationships and contracts, unjust enrichment, and violations of the Computer Fraud and Abuse Act, among other things.

98.    Each Defendant knowingly agreed to engage, and did engage, in one or more overt acts in pursuit of the conspiracy as set forth with more particularity in this Complaint.

99.    Plaintiff has been proximately damaged by the conspiracy and Defendants' actions in furtherance thereof.

100.    There is no adequate remedy at law to fully compensate Plaintiff for the harm caused by Defendants' conspiracy.

## COUNT FOUR

### UNJUST ENRICHMENT

101.    Plaintiff reasserts the allegations set forth in Paragraphs 1 through 67 above as though fully set forth herein.

102.    By bulk acquisition of MetroPCS Handsets at less than the manufacturer's cost of the Handsets with no intention of using the Handsets on MetroPCS service in accordance with the Terms and Conditions, and resale of MetroPCS Handsets for profit, Defendants have obtained benefits from Plaintiff that have caused significant harm to Plaintiff and resulted in significant financial gain to Defendants through their resale of the illicitly-acquired MetroPCS Handsets.

103.    Defendants have acquired the benefits voluntarily and with full knowledge of the benefits.

104.    Defendants have retained the benefits under such circumstances that make it unjust and inequitable for Defendants to retain the benefits without paying Plaintiff the value of the benefits Defendants acquired.

24

112803843.1

025

105.    There is no adequate remedy at law to fully compensate Plaintiff for the harm caused by Defendants' unjust enrichment.

**COUNT FIVE**

**COMMON LAW FRAUD AND FRAUDULENT MISREPRESENTATION**

106.    Plaintiff reasserts the allegations set forth in Paragraphs 1 through 67 above as though fully set forth herein.

107.    As part of the Handset Theft and Trafficking Scheme, each Defendant, directly or indirectly through co-conspirators, regularly and systematically misrepresent to Plaintiff that the MetroPCS Handsets are being acquired for a legitimate purpose, that the Handsets will be used by Defendants or other legitimate consumers with MetroPCS service, and that they will perform in accordance with the Terms and Conditions.

108.    On information and belief, each Defendant defrauded Plaintiff to acquire MetroPCS products to be unlocked, resold, and ultimately shipped overseas for activation on foreign carrier networks.

109.    When Defendants, directly or through their co-conspirators, acquire MetroPCS Handsets as part of the Scheme, they do not intend to use the Handsets for a legitimate purpose or to activate them or maintain them as active on MetroPCS service, or otherwise perform in accordance with the Terms and Conditions.

110.    Defendants and their co-conspirators know that they are required to activate the MetroPCS Handsets for use on Plaintiff's service, pay the monthly service charge, and otherwise comply with the Terms and Conditions.

111.    Defendants intended for Plaintiff to rely on their misrepresentations, and/or the misrepresentations of their co-conspirators, to allow Defendants to acquire and unlock the Handsets for improper purposes.

112803843.1

112.    Plaintiff's reliance on the misrepresentations of Defendants and their co-conspirators was reasonable under the circumstances.

113.    Plaintiff has been damaged and continues to suffer damages as a result of Defendants' actions.

114.    There is no adequate remedy at law to fully compensate Plaintiff for the harm caused by Defendants' fraud.

<u>**COUNT SIX**</u>

**TRAFFICKING IN COMPUTER PASSWORDS**
**18 U.S.C. § 1030(a)(6)**

115.    Plaintiff reasserts the allegations set forth in Paragraphs 1 through 67 above as though fully set forth herein.

116.    The MetroPCS Handsets that are trafficked by Defendants are loaded with confidential codes/passwords that access: (a) Plaintiff's national telecommunications computer network to make and receive wireless voice calls and to transmit data, and (b) Plaintiff's computer billing network (collectively, "Plaintiff's protected computer networks"). As such, the Handsets act as a gateway to Plaintiff's protected computer networks. Plaintiff restricts access to these protected computer networks through, among other things, the confidential codes/passwords contained in the Handsets ("security codes").

117.    Through their Scheme, Defendants are knowingly trafficking in the confidential codes contained in the Handsets with the intent to defraud Plaintiff.

118.    Upon information and belief, once Defendants unlawfully acquire the MetroPCS Handsets, they or their co-conspirators use fraudulently-obtained security codes/passwords to gain additional access to Plaintiff's protected computer networks. This additional access into Plaintiff's protected computer networks is not authorized in any way. Upon information and

26

112803843.1

027

belief, Defendants or their co-conspirators share these confidential codes/passwords and methodologies for unlocking MetroPCS Handsets among themselves and with their co-conspirators.

119. Upon information and belief, Defendants or their co-conspirators acquire the unlocking codes/passwords and methodologies for unlocking MetroPCS Handsets by misrepresenting to Plaintiff, either directly or through one of their co-conspirators, that the Handsets are being acquired and unlocked for a legitimate purpose for use by legitimate consumers with MetroPCS service, when, in fact, they are not.

120. Upon information and belief, Defendants or their co-conspirators unlawfully access Plaintiff's protected computer networks using fraudulently-obtained confidential codes/passwords to: (1) perform various tests to confirm that the Handset they are purchasing is, in fact, an active MetroPCS Handset; and/or (2) unlock the MetroPCS Handset, which requires the manipulation and oftentimes permanent deletion of the proprietary software that is installed in MetroPCS Handsets and make unauthorized changes in Plaintiff's protected computer networks so the MetroPCS Handset will operate on other networks.

121. Through the Handset Theft and Trafficking Scheme, Defendants and their co-conspirators are knowingly trafficking in the confidential codes/passwords contained in the Handsets with the intent to defraud and harm Plaintiff.

122. Defendants' transfer of the Handsets and confidential codes to others constitutes "trafficking" of the codes as defined in 18 U.S.C. § 1029 in that the codes/passwords were transferred, or otherwise disposed of, to others, or Defendants obtained control of the codes/passwords with intent to transfer or dispose of them.

123. Defendants' trafficking of the Handsets substantially affects interstate commerce and communication in that the codes/passwords contained in the Handsets are trafficked over the

27

internet, throughout the United States, and around the world, and Plaintiff's protected computer

networks are used in and affect interstate commerce and communication, and provide wireless

communication services pursuant to licenses issued by the Federal Communications

Commission.

124.    Defendants and their co-conspirators' trafficking of illicitly-acquired

codes/passwords to access Plaintiff's protected computer networks has caused and will continue

to cause Plaintiff to suffer injury, with "damages" and "losses" – as those terms are defined in

Sections 1030(e)(8) and 1030(e)(11), respectively – substantially in excess of $5,000 over a one-

year period.

125.    With respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year

period assessing its protected computer networks for damage and taking steps to prevent future

unauthorized access by Defendants and/or their co-conspirators.

126.    Also with respect to loss, Plaintiff has spent well in excess of $5,000 over a one-

year period, investigating Defendants' intrusions into Plaintiff's protected computer networks,

assessing the possible impairment to the integrity of its protected computer networks and

conducting damage assessment regarding Defendants collection and dissemination of MetroPCS

Handsets and security codes, as well as tracking down fraudulently sold Handsets.

127.    Moreover, with respect to loss, Plaintiff has spent well in excess of $5,000 over a

one-year period in costs to discover Defendants' identity and/or the method by which Defendants

access Plaintiff's protected computer networks without authorization.

128.    With respect to damage, by infiltrating Plaintiff's computer and

telecommunications network and collecting and disseminating the illegally activated Handsets

and codes/passwords, Defendants and their co-conspirators have substantially impaired the

integrity of Plaintiff's protected computer networks in an amount in excess of $5,000.

28

112803843.1

Moreover, Defendants' actions have deprived Plaintiff of the means to control the quality of its products and services.

129.     Defendants' activities constitute trafficking in computer passwords in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(6).

130.     Defendants' conduct is intentional, malicious and willful.

131.     Pursuant to 18 U.S.C. § 1030(g), Plaintiff is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief for the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C. § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to Plaintiff and its MetroPCS customers as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

## COUNT SEVEN

### UNAUTHORIZED ACCESS
### 18 U.S.C. § 1030(a)(5)(C)

132.     Plaintiff reasserts the allegations set forth in Paragraphs 1 through 67 above as though fully set forth herein.

133.     The MetroPCS Handsets that are trafficked by Defendants are loaded with confidential codes/passwords that access: (a) Plaintiff's national telecommunications computer network to make and receive wireless voice calls and to transmit data, and (b) Plaintiff's computer billing network (collectively, "Plaintiff's protected computer networks").  As such, the Handsets act as a gateway to Plaintiff's protected computer networks.  Plaintiff restricts access to these protected computer networks through, among other things, the confidential codes/passwords contained in the Handsets ("security codes").

134.     In general, MetroPCS Handsets are connected to and activated on Plaintiff's protected computer networks when purchased from MetroPCS.

29

135.     Plaintiff's proprietary computer system holds confidential information, is connected to the internet, and assists in providing federally-regulated telecommunications services.  Plaintiff's computer systems are "protected computers" as that term is defined in Section 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

136.     In furtherance of their Handset Theft and Trafficking Scheme, Defendants and/or their co-conspirators use fraud and misrepresentation to acquire MetroPCS Handsets, including the most in-demand smartphones, and in so doing void any purchase agreement and any legitimate access to Plaintiff's computer networks.  As such, Defendants' access to the Handsets and into Plaintiff's protected computer networks is not authorized in any way.

137.     Upon information and belief, once Defendants unlawfully acquire the MetroPCS Handsets, they or their co-conspirators use fraudulently-obtained confidential codes/passwords to gain additional access to Plaintiff's protected computer networks.  This additional access into Plaintiff's protected computer networks is not authorized in any way.

138.     Upon information and belief, Defendants acquire the unlocking codes/passwords and methodologies for unlocking MetroPCS Handsets by misrepresenting to Plaintiff, either directly or through one of his co-conspirators, that the Handsets are being acquired and unlocked for a legitimate purpose for use by legitimate consumers with MetroPCS service, when, in fact, they are not.

139.     Defendants or their co-conspirators knowingly and with the intent to defraud, cause Plaintiff to access its proprietary computer systems.  Defendants are not authorized to do so.

112803843.1

031

140. Further, by illicitly acquiring and unlocking the Handsets, Defendants necessarily access Plaintiff's protected computer networks because the Handsets are connected to those networks when acquired from MetroPCS.

141. Defendants acquire and, in some circumstances, unlock the Handsets by misrepresenting to Plaintiff, either directly or through a third-party agent, that the Handsets are being acquired and unlocked for a legitimate purpose and for use by legitimate consumers with MetroPCS service, when, in fact, they are not. Defendants use fraud and misrepresentation to acquire the Handsets from MetroPCS, and, as such, Defendants' access of Plaintiff's protected computer networks is not authorized in any way.

142. Upon information and belief, when Defendants acquire a MetroPCS Handset from runners/mules acting on their behalf, Defendants carefully examine the Handset to confirm it is an active MetroPCS Handset and that the various electronic code numbers and access numbers loaded on the Handset are correct. This too constitutes unauthorized access of Plaintiff's protected computer networks via a password, contained in the Handset, obtained through fraud and misrepresentation.

143. Further, by reselling active MetroPCS Handsets from MetroPCS dealers, Defendants are knowingly, intentionally, and with the intent to defraud, facilitating the unauthorized access of Plaintiff's protected computer networks.

144. Defendants' illegal and unauthorized access of Plaintiff's protected computer systems allows them to improperly steal Plaintiff's investment in MetroPCS Handsets.

145. Defendants' activities substantially affect interstate commerce and communication in that, by Defendants' own admission, the Handsets are acquired and trafficked throughout the United States and around the world, and Plaintiff's computer system and telecommunications network are used in and affect interstate commerce and communication, as

31

well as provide wireless communication services pursuant to licenses issued by the Federal Communications Commission.

146.    Defendants' unauthorized access of Plaintiff's protected computer systems has caused and will continue to cause Plaintiff to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively – substantially in excess of $5,000 over a one-year period.

147.    With respect to loss, Plaintiff has lost its investments in the illegally-acquired secure MetroPCS Handsets and spent well in excess of $5,000 investigating and assessing the possible impairment to the integrity of its protected computer systems, taking remedial action to counteract Defendants' intrusions, conducting a damage assessment regarding Defendants' collection and dissemination of MetroPCS Handsets, and tracking down fraudulently sold Handsets.

148.    Moreover, with respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year period in costs to discover Defendants' identity and/or the method by which Defendants' accessed Plaintiff's protected computer networks without authorization.

149.    With respect to damage, by infiltrating Plaintiff's computer systems and collecting and disseminating the illegally-trafficked Handsets, Defendants have substantially impaired the integrity of Plaintiff's systems in an amount in excess of $5,000.  Moreover, Defendants' actions have deprived Plaintiff of the means to control the quality of its products and services, and have stolen Plaintiff's financial investment in MetroPCS Handsets.

150.    Defendants' activities constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(C).

151.    Defendants' conduct is intentional, malicious and willful.

112803843.1

033

152.    Pursuant to 18 U.S.C. § 1030(g), Plaintiff is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief because of the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C. § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to Plaintiff and its MetroPCS customers as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

## COUNT EIGHT

### UNAUTHORIZED ACCESS WITH INTENT TO DEFRAUD
### 18 U.S.C. § 1030(a)(4)

153.    Plaintiff reasserts the allegations set forth in Paragraphs 1 through 67 above as though fully set forth herein.

154.    The MetroPCS Handsets that are acquired by Defendants, directly and/or from their co-conspirators, in furtherance of the Handset Theft and Trafficking Scheme, are loaded with codes/passwords that access: (a) Plaintiff's national telecommunications computer network to make and receive wireless voice calls and to transmit data, and (b) Plaintiff's computer billing network (collectively, "Plaintiff's protected computer networks").   In addition, manufacturers that produce MetroPCS wireless phones for Plaintiff install proprietary and confidential software, ordered and paid for by Plaintiff, on the MetroPCS Handsets to lock the Handsets to Plaintiff's protected computer networks and prevent the Handsets from being used other than with MetroPCS service.

155.    In general, MetroPCS Handsets are connected to and activated on Plaintiff's protected computer networks when purchased from MetroPCS.

156.    In furtherance of their Handset Theft and Trafficking Scheme, Defendants and/or their co-conspirators use fraud and misrepresentation to acquire MetroPCS Handsets, including the most in-demand smartphones, and in so doing void any purchase agreement and any

33

legitimate access to Plaintiff's computer networks. As such, Defendants' access to the Handsets and into Plaintiff's protected computer networks is not authorized in any way.

157. Upon information and belief, once Defendants unlawfully acquire the MetroPCS Handsets, they or their co-conspirators use fraudulently-obtained confidential codes/passwords to gain additional access to Plaintiff's protected computer networks. This additional access into Plaintiff's protected computer networks is not authorized in any way.

158. Upon information and belief, Defendants unlawfully access Plaintiff's protected computer networks using fraudulently-obtained confidential codes/passwords to: (1) perform various tests to confirm that the Handset they are purchasing is, in fact, an active MetroPCS Handset; and/or (2) unlock the MetroPCS Handset, which requires the manipulation and oftentimes permanent deletion of the proprietary software that is installed in MetroPCS Handsets and make unauthorized changes in Plaintiff's protected computer networks so the MetroPCS Handset will operate on other networks.

159. Defendants are knowingly, intentionally, and with the intent to defraud, facilitating the unauthorized access of Plaintiff's protected computer networks.

160. Defendants' access of Plaintiff's protected computer systems allows them to improperly steal Plaintiff's substantial financial investment in MetroPCS Handsets.

161. Plaintiff's protected computer systems are "protected computers" as that term is defined in Section 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

162. Defendants' activities substantially affect interstate commerce and communication in that, by Defendants' own admission, the Handsets are acquired and trafficked throughout the United States and around the world, and Plaintiff's computer system and telecommunications network are used in and affect interstate commerce and communication, as

34

112803843.1

well as provide wireless communication services pursuant to licenses issued by the Federal Communications Commission.

163.    Defendants' unauthorized access of Plaintiff's protected computer systems has caused and will continue to cause Plaintiff to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively – substantially in excess of $5,000 over a one-year period.

164.    With respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year period assessing its protected computer networks for damage and taking steps to prevent future unauthorized access by Defendants and/or their co-conspirators.

165.    In addition, with respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year period identifying the impairment of or damage to Plaintiff's protected computer networks that Defendants' and/or their co-conspirators accessed with authorization.

166.    Further, with respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year period in costs associated with investigating Defendants' and/or their co-conspirators' intrusions into Plaintiff's protected computer networks and taking subsequent remedial measures.

167.    Moreover, with respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year period in costs to discover Defendants' identity and/or the method by which Defendants' accessed Plaintiff's protected computer networks without authorization.

168.    With respect to damage, by infiltrating Plaintiff's computers systems and collecting and disseminating the illegally-obtained Handsets, Defendants have substantially impaired the integrity of Plaintiff's systems in an amount in excess of $5,000. Moreover, Defendants' actions have deprived Plaintiff of the means to control the quality of MetroPCS products and services, and have stolen Plaintiff's financial investment in its Handsets.

112803843.1

036

169.    Defendants' activities constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4).

170.    Defendants' conduct is intentional, fraudulent, malicious and willful.

171.    Pursuant to 18 U.S.C. § 1030(g), Plaintiff is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief because of the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C. § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to Plaintiff and its MetroPCS customers as a result of Defendants' conduct during any one year period aggregated is at least $5,000 in value.

## COUNT NINE

### FEDERAL TRADEMARK INFRINGEMENT
### 15 U.S.C. § 1114 [§ 32(1) of the Lanham Act]

172.    Plaintiff reasserts the allegations set forth in Paragraphs 1 through 67 above as though fully set forth herein.

173.    Defendants' and/or their co-conspirators' aforementioned conduct constitutes use of certain federally-registered MetroPCS Marks without authorization in connection with their conspiracy to sell and offer for sale unlocked, materially-different MetroPCS Handsets, which downstream customers will discover have been altered from their original state and do not include the warranties, accessories, manuals and related items that constitute part of the MetroPCS Handset package.

174.    Defendants' and/or their co-conspirators' use of certain federally-registered MetroPCS Marks in connection with the sale of MetroPCS Handsets has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' infringing products, and the relationship between Plaintiff and Defendants.

112803843.1

037

175.    Defendants' and/or their co-conspirators' unauthorized use of certain federally-registered MetroPCS Marks in connection with their participation in the Scheme is likely to continue in the future, all to the great and irreparable damage to the business, reputation and goodwill of Plaintiff.

176.    Defendants' and/or their co-conspirators' use of certain federally-registered MetroPCS Marks in connection with the unlocked, materially-different MetroPCS Handsets, which do not include warranties, manuals, accessories and related items made part of the MetroPCS Handset package, and may have been flagged as "Bad IMEI" Handsets and not able to be activated with MetroPCS service, constitutes a misappropriation of Plaintiff's distinguishing and identifying federally-registered trademarks that were created as a result of significant effort and expense by Plaintiff and its predecessor-in-interest over a long period of time.

177.    Defendants' and/or their co-conspirators' use of certain federally-registered MetroPCS Marks evokes an immediate, favorable impression or association and constitutes a false representation that the products and business of Defendants have some connection, association or affiliation with Plaintiff, and is likely to mislead the trade and public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by Plaintiff.

178.    Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, Plaintiff and the reputation and goodwill of Plaintiff, and have been unjustly enriched and will continue to unjustly enrich themselves at the expense of Plaintiff.

179.    Plaintiff is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are enjoined from committing and continuing to commit such acts.

112803843.1

180.    Defendants' aforesaid acts constitute willful infringement of Plaintiff's aforementioned federally registered trademarks in violation of 15 U.S.C. § 1114.

## COUNT TEN

**FEDERAL COMMON LAW TRADEMARK INFRINGEMENT
AND FALSE ADVERTISING
15 U.S.C. § 1125 (a)(1)(A) and (B) [§ 43(a) of the Lanham Act]**

181.    Plaintiff reasserts the allegations set forth in Paragraphs 1 through 67 above as though fully set forth herein.

182.    Defendants' and/or their co-conspirators' aforementioned conduct constitutes use of at least one of the MetroPCS Marks without authorization in connection with their conspiracy to sell and offer for sale unlocked, materially-different MetroPCS Handsets, which downstream customers will discover have been altered from their original state, are inoperable on MetroPCS service, and do not include the warranties, accessories, manuals and related items that constitute part of the MetroPCS Handset package.

183.    Defendants' and/or their co-conspirators' use of at least one of the MetroPCS Marks in connection with the sale of unlocked, materially-different MetroPCS Handsets has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' materially-different products, and the relationship between Plaintiff and Defendants.

184.    Defendants' and/or their co-conspirators' unauthorized use of at least one of the MetroPCS Marks is likely to continue in the future, all to the great and irreparable damage to the business, reputation, and goodwill of Plaintiff.

185.    Defendants' and/or their co-conspirators' use of at least one of the MetroPCS Marks in connection with the unlocked, materially-different MetroPCS Handsets, which do not include warranties, manuals, accessories and related items made part of the MetroPCS Handset

38

package, and, in some cases, have been flagged as "Bad IMEI" Handsets and not able to be activated on MetroPCS service, constitutes a misappropriation of at least one of the distinguishing and identifying MetroPCS Marks that was created as a result of significant effort and expense.

186.     Defendants' and/or their co-conspirators' use of at least one of the MetroPCS Marks evokes an immediate, favorable impression or association and constitutes a false representation that the products and business of Defendants have some connection, association, or affiliation with MetroPCS, and thus constitutes false designation of origin and is likely to mislead the trade and public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by MetroPCS. Defendants are not affiliated with MetroPCS in any way.

187.     Defendants, in committing the foregoing acts in commerce, have damaged and will continue to damage Plaintiff and Plaintiff's reputation, and have been unjustly enriched and will continue to unjustly enrich themselves at Plaintiff's expense.

188.     Plaintiff is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are enjoined from committing and continuing to commit such acts.

189.     Defendants' use of at least one of the MetroPCS Marks in promotion misrepresents the nature, characteristics, and/or qualities of their infringing products.  Such promotion is false and/or misleading and deceives, or has the capacity to deceive, consumers. The deception and misrepresentations have a material effect on the purchasing decisions and affect interstate commerce.

112803843.1

040

190.    Defendants' activities constitute false designation of origin, false descriptions and representations, and false advertising in commerce in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and (B).

191.    Plaintiff is entitled to appropriate relief requested herein, including preliminary and permanent injunctive relief.

192.    Defendants knew or should have known that Plaintiff is the owner of the MetroPCS Marks and that Defendants have no legal right to use any of the MetroPCS Marks on their infringing products.

193.    Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, so as to justify the assessment of exemplary damages and an award of Plaintiff's lost profits, Defendants' profits, and Plaintiff's attorneys' fees.

**COUNT ELEVEN**

**CONTRIBUTORY TRADEMARK INFRINGEMENT**

194.    Plaintiff reasserts the allegations set forth in Paragraphs 1 through 67 above as though fully set forth herein.

195.    By misappropriating and using at least one of the MetroPCS Marks in connection with the Handset Theft and Trafficking Scheme, Defendants knowingly aided and enabled distributors and/or sellers of their products to market them to members of the general public in a way that infringes at least one of the MetroPCS Marks by placing in the hands of distributors and/or sellers an instrument of consumer deception.

196.    Defendants' unlawful, unauthorized, and unlicensed sale of unlocked MetroPCS Handsets has contributed to the creation of express and implied misrepresentations that the MetroPCS Handsets, as sold by Defendants, were created, authorized or approved by Plaintiff, may be activated on MetroPCS service, and include warranties.

40

112803843.1

041

197.     Upon information and belief, Defendants' conduct leads to post-sale confusion by causing consumers who purchase MetroPCS Handsets from Defendants or their co-conspirators to believe that they are purchasing legitimate MetroPCS handsets approved by Plaintiff that can be activated on MetroPCS service and contain original warranties.

198.     Defendants' conduct constitutes contributory infringement in violation of the Trademark Act. Defendants' conduct is intentional, malicious, and willful.

199.     Plaintiff has been damaged and continues to suffer damages as a result of Defendants' actions.

200.     There is no adequate remedy at law to fully compensate Plaintiff for the harm caused by Defendants' actions.

## COUNT TWELVE

### CONVERSION

201.     Plaintiff reasserts the allegations set forth in Paragraphs 1 through 67 above as though fully set forth herein.

202.     Defendants have and are engaged in acts of conversion in violation of the law of the Commonwealth of Pennsylvania.

203.     Plaintiff has the right to provide MetroPCS Handsets and wireless service to the public. Defendants have no such privilege or right.

204.     Defendants knew or should have known that they obtained the Handsets through illegitimate means and had no legal right to advertise, use or resell them.

205.     Defendants are wrongfully interfering with Plaintiff's rights by engaging in the Handset Theft and Trafficking Scheme.

206.     Defendants intentionally and willfully exerted dominion and ownership over the MetroPCS Handsets.

112803843.1

207.    Defendants' conversion of Plaintiff's property has caused and continues to cause Plaintiff to suffer irreparable injury, loss of reputation, and exemplary damages to be proved at trial.   Unless enjoined by this Court, Defendants will continue these acts, thereby causing Plaintiff further immediate and irreparable damage.

## COUNT THIRTEEN

### INJURY TO BUSINESS OR REPUTATION; DILUTION OF TRADEMARKS
### 54 Pa.C.S.A. § 1124

208.    Plaintiff reasserts the allegations set forth in Paragraphs 1 through 67 above as though fully set forth herein.

209.    Plaintiff is the lawful owner of the MetroPCS brand name and federally-registered MetroPCS Marks, which are famous in the Commonwealth of Pennsylvania.

210.    Defendants' and/or their co-conspirators' aforementioned conduct constitutes use of federally-registered MetroPCS Marks without authorization in connection with their conspiracy to sell and offer for sale unlocked, counterfeit MetroPCS Handsets, which downstream customers will discover have been altered from their original state and do not include the warranties, accessories, manuals and related items that constitute part of the MetroPCS Handsets package.

211.    Defendants' and/or their co-conspirators' use of certain federally-registered MetroPCS Marks in connection with the sale of MetroPCS Handsets has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' infringing products, and the relationship between MetroPCS and Defendants.

212.    Defendants' and/or their co-conspirators' unauthorized use of certain federally-registered MetroPCS Marks will continue to cause dilution of the distinctive quality of the MetroPCS Marks and irreparable damage to the business, reputation, and goodwill of MetroPCS.

42

213.   Defendants' use of certain federally-registered MetroPCS Marks in commerce began after the MetroPCS Marks became famous.

214.   Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, MetroPCS and the reputation and goodwill of MetroPCS, and have been unjustly enriched and will continue to unjustly enrich themselves at the expense of MetroPCS.   MetroPCS is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are enjoined from committing and continuing to commit such acts.

215.   Defendants' acts constitute willful trading on MetroPCS's federally-registered trademarks and willful dilution of the famous Marks.

216.   MetroPCS has been damaged and continues to suffer damages as a result of Defendants' actions.   There is no adequate remedy at law to fully compensate MetroPCS for the harm caused by Defendants' actions.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

WHEREFORE, Plaintiff respectfully requests that this Court enter final judgment and permanent injunctive relief in favor of Plaintiff and against Defendants, as follows:

(a)   awarding Plaintiff its compensatory, consequential, statutory and special damages including, without limitation, its lost profits, Defendants' profits, loss of goodwill and damage to its reputation, as well as exemplary damages, together with pre and post judgment interest, as provided by law;

(b)   awarding Plaintiff its reasonable attorneys' fees and costs associated with this action;

43

112803843.1

044

(c) granting permanent injunctive relief in favor of Plaintiff and against

Defendants, enjoining Defendants from engaging in the unlawful practices

described in this Complaint;

(d) requiring Defendants, pursuant to the Lanham Act, to deliver to Plaintiff its

entire inventory of phones and products bearing or infringing the MetroPCS

Marks or a confusingly similar copy thereof; and

(e) granting such further relief as this Court deems just and proper.

Respectfully submitted this ___ day of October, 2017.

By: _____
Adam P. Schwartz
PA Bar. No. 76769
Email: aschwartz@carltonfields.com
**CARLTON FIELDS JORDEN BURT, P.A.**
4221 West Boy Scout Blvd., Suite 1000
Tampa, Florida 33607
Phone: (813) 223-7000
Fax: (813) 229-4133

James B. Baldinger (*To be admitted pro hac vice*)
Florida Bar No. 869899
Email: jbaldinger@carltonfields.com
Stacey K. Sutton (*To be admitted pro hac vice*)
Florida Bar No. 289530
Email: ssutton@carltonfields.com
Alana Zorrilla-Gaston (*To be admitted pro hac vice*)
Florida Bar No. 27256
Email: agaston@carltonfields.com
**CARLTON FIELDS JORDEN BURT, P.A.**
525 Okeechobee Boulevard, Suite 1200
West Palm Beach, Florida 33401
Phone: (561) 659-7070
Fax: (561) 659-7368

*Attorneys for Plaintiff*

44

112803843.1

045

# B.  Declaration of Stacey K. Sutton

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| METROPCS, a brand of T-MOBILE USA, Inc., a Delaware Corporation, | ) ) |
| | ) |
| Plaintiff, | ) ) |
| | ) |
| v. | ) ) |
| | ) |
| ISAIAH MICHAEL THOMAS, individually and d/b/a GO PHONEZ, ZAMIR JEFFERSON, CHRISTOPHER ALEXANDER T. JOHNSON, BRION R. BENSON, ROLAN STEPHENS, KEOSHA LAWSON, and NINA STEWART, | ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) ) |
| | ) |

Miscellaneous Case No. 3:18-mc-00029-K-BN

(Relates to U.S.D.C., Eastern District of Pennsylvania Case No: 2:17-cv-04557-MMB)

## DECLARATION OF STACEY K. SUTTON

I, Stacey K. Sutton, having personal knowledge of the matters set forth below, declare and state the following:

1.    I am over the age of 18 and am otherwise *sui juris*.  I am a shareholder in the Carlton Fields Jorden Burt, P.A. law firm ("Carlton Fields"), representing Plaintiff MetroPCS, a brand of T-Mobile USA, Inc. ("Plaintiff" or "MetroPCS").

2.    This Declaration is based on my personal knowledge or a review of documents created and maintained by Carlton Fields in the ordinary course of business.

3.    This Declaration is submitted in support of MetroPCS's Motion to Compel Discovery ("Motion to Compel") and Response in Opposition to Petitioner's (Lorraine Frazin) Motion to Quash Subpoena and for Supplemental Relief ("Motion to Quash") [DE 1] and Incorporated Memorandum of Law.

4.      MetroPCS filed the underlying lawsuit against seven defendants ("Defendants") because they are engaged in and knowingly conspire with others in unlawful business practices as described in the Complaint in the underlying action.

5.      During discovery, MetroPCS learned from non-party deponent Tom Vanderbosch that third parties, including among others Lorraine Frazin ("Frazin"), are believed to have knowledge of the activities described in the Complaint.  True and correct excerpts from the Deposition of Tom Vanderbosch are attached as **Exhibit 1**.

6.      On March 30, 2018, MetroPCS issued a subpoena *duces tecum* to Frazin (the "Subpoena") which commanded Frazin to appear at a deposition in Dallas, Texas, on April 19, 2018, and to produce specific categories of documents related to MetroPCS Handsets.  A true and correct copy of the Subpoena is attached as **Exhibit 2**.

7.      On April 10, 2018, Frazin responded to MetroPCS by letter (sent via email) through her counsel.  A true and correct copy of Frazin's April 10, 2018 letter is attached as **Exhibit 3**.

8.      On April 16, 2018, MetroPCS responded to Frazin by letter (sent via email) through its counsel.  A true and correct copy of MetroPCS's April 16, 2018 letter is attached as **Exhibit 4.**

9.      On April 18, 2018, after close of business, Frazin's counsel wrote to MetroPCS advising that Frazin would not attend her deposition the following day.  A true and correct copy of Frazin's April 18, 2018 e-mail is attached as **Exhibit 5**.

10.      MetroPCS's counsel had already traveled to Dallas by the time Frazin advised that she would not appear at the deposition.

11.    Lorraine Frazin's son, Jason Frazin, was also served with a deposition subpoena in this case and similarly waited until the night before his deposition to notify MetroPCS's counsel that he would not attend his deposition.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 3rd day of May, 2018.

By: _____

Stacey K. Sutton

049

# EXHIBIT 1

Page 1

1          UNITED STATES DISTRICT COURT

        EASTERN DISTRICT OF PENNSYLVANIA

2

3

4  METROPCS, A BRAND OF          *

   T-MOBILE USA, INC., A          *

5  DELEWARE CORPORATION          *

                                  *

6  VS.                            *  CIVIL ACTION NO.

                                  *  2:17-CV-04557-MMB

7  ISAIAH MICHAEL THOMAS,        *

   ET AL.                         *

8

9

10        *********************************

11        ORAL DEPOSITION OF TOM K. VANDERBOSCH

12             FEBRUARY 28, 2018

13        *********************************

14

15  Job No: 137874

16

17          ANSWERS AND DEPOSITION OF TOM K. VANDERBOSCH,

18  produced as a witness at the instance of the Plaintiff,

19  taken in the above-styled and -numbered cause on the

20  28th day of February, 2018, at 3:12 p.m., before Susan

21  M. Foreman, a Certified Shorthand Reporter in and for

22  the State of Texas, in the offices of Gray Reed &

23  McGraw, located at 1601 Elm Street, Suite 4600, in the

24  City of Dallas, County of Dallas, and State of Texas, in

25  accordance with the Federal Rules of Civil Procedure.

1                    A P P E A R A N C E S

2

    FOR THE PLAINTIFF
3         STACEY SUTTON, ESQ.
          CARLTON FIELDS JORDEN BURT
4         525 Okeechobee Boulevard
5         West Palm Beach, Florida  33401
6

7

8   FOR THE DEFENDANT PRO SE
          TOM VANDERBOSCH
9         C/O Adrina Hanley/G.L. Hanley Insurance
          4411A Gus Thomason
10        Mesquite, Texas  75150
11

12

13

14

15

16  ALSO PRESENT:  Mr. Michael Finney (via telephone)
17

18

19

20

21

22

23

24

25

1                          I N D E X

2                                                    PAGE

3    Appearances.................................  2

4

5    TOM K. VANDERBOSCH

          Examination by Ms. Sutton................  4

6

7    Witness's Signature Page/Corrections..........  152

8

     Reporter's Certificate.......................  154

9

10

                          EXHIBITS

11

     NUMBER            DESCRIPTION              PAGE MARKED

12

     Exhibit 1    Plaintiff's Subpoena Duces        6

13                 Tecum

14   Exhibit 2    Copies of Photographs            42

15   Exhibit 3    Jason-Texas Website Information  76

16   Exhibit 4    Copy of Photograph               81

17   Exhibit 5    Spreadsheet of Purchases         115

18

19

20

21

22

23

24

25

Page 14

                    TOM K. VANDERBOSCH

1

2      Q.  What is the apartment number?

3      A.  It is Apartment ███.

4      Q.  How long have you lived there?

5      A.  I'm not exactly sure, maybe two and a half,

6  maybe three years.  I'm not sure.  I know I have to

7  leave in June.  It got bought up and they're raising the

8  rent to ███████████, and since that would be almost my

9  entire check, I'm going to have to leave.

10     Q.  Did you previously live at 6930 Elm Ridge Drive

11 in Dallas?

12     A.  6930 Elm Ridge Drive.  No, never.

13     Q.  Do you live with anyone at your present

14 address?

15     A.  No.

16     Q.  So, Mr. Vanderbosch, do you know an individual

17 by the name of Jason Frazin?

18     A.  I do.

19     Q.  How do you know Mr. Frazin?

20     A.  He's my friend.

21     Q.  How long have you known Mr. Frazin?

22     A.  Over 20 years.

23     Q.  Do you work with Mr. Frazin on any part-time

24 basis?

25     A.  I do not.

1                    TOM K. VANDERBOSCH

2      A.  I don't know the ZIP.  It's 20 -- 2 -- 75240 or

3   241.  I'm not sure.

4      Q.  Okay.

5              So, Mr. Vanderbosch, what makes you believe

6   that Mr. Frazin is a stay-at-home dad?

7      A.  I watch him raise his kids at home; that's what

8   he does.  He goes out and buys stuff, but he's a

9   hoarder.

10     Q.  He's a hoarder?

11     A.  Yeah, just like his mom.  His mom is even

12  worse.

13     Q.  Is that Lorraine?

14     A.  Yeah.

15     Q.  Are you a hoarder?

16     A.  No.

17     Q.  Okay.

18             THE WITNESS:  Can you do a big, long no

19  with exclamations points?  Because I would really

20  appreciate it if you could.

21     Q.  Emphasize the no.

22     A.  Yeah, seriously.

23     Q.  Okay.  Mr. Vanderbosch, do you have an e-mail

24  address?

25     A.  I do.

1                    TOM K. VANDERBOSCH

2    read them.

3         Q.  We lawyers are -- we're everywhere, right?

4              The --

5         A.  I understand they're for protection of the

6    people and whatnot, but it's just a pain to read.

7         Q.  Do you -- for your Ebay account, do you use

8    PayPal?

9         A.  I have a PayPal account that Jay puts money

10   into from time to time, but -- and sometimes I put money

11   in too, but no, mostly I just use my credit card -- or

12   sorry, my business and personal debit card.  Years ago

13   we tried to start a business.  Didn't work, but...

14        Q.  Who is we?  Was it you and Jay?

15        A.  Yes.

16        Q.  What kind of business was it?

17        A.  It was buying and selling stuff online.

18        Q.  And was it an Ebay -- did you have an Ebay

19   store?

20        A.  No, Jay had the Ebay store.  I would just go

21   buy stuff and, you know, he would sell it.

22        Q.  When you say you would go buy it, would you do

23   it physically or online?

24        A.  Well, physically most of the time.  He'd say,

25   Tom, there's a deal, go to Best Buy.  Okay.

Page 45

1                    TOM K. VANDERBOSCH

2      Q.  And then the one that's on the back.

3           Thank you.

4      A.  You don't have the little hill in here.

5 There's like a little hill that rabbits hide in.

6      Q.  We'll have to do a better job photographing

7 next time.

8      A.  That is Jay's mother's house.

9      Q.  Okay.  Have you been there?

10     A.  Yeah, several times.

11     Q.  And that's --

12     A.  In fact --

13     Q.  -- Lorraine?

14     A.  Yeah, Lorraine's.

15          I think it's Lorraine's, maybe it's not,

16 but I think it is.

17     Q.  Okay.

18     A.  When I go there, she'll give me an apple, and

19 they're organic apples.

20     Q.  Does -- has Jay ever lived at his mom's house,

21 to your knowledge?

22     A.  He has years ago, but he doesn't live there

23 now.

24     Q.  He hasn't lived there in a while?

25     A.  He has a house, like a two-story house of his

Page 53

TOM K. VANDERBOSCH

1

2    A.  Not sure.  Maybe four years ago and then -- and

3    then three years ago, because it's been about a year and

4    a half since, you know, we've done anything because of

5    that policy.

6    Q.  Okay.  So -- it was -- it was probably around

7    sometime in 2014 that you opened it and sometime maybe

8    end of 2015 --

9    A.  Middle 2015, like in June or so.

10    Q.  -- you closed it?

11    A.  Didn't close it.  It -- I mean --

12    Q.  You just stopped stocking it?

13    A.  There's still stock in the store.  It's being

14    paid for by the money that was built up, but I've never

15    received a profit from it.  I'm not supposed to.  It's

16    supposed to be going, you know, for saving for a house

17    that Jay holds and I don't think he profited from it

18    either because -- well, I don't know about that.

19    Q.  Where -- where did you store the products that

20    Jay would tell you to go purchase?

21    A.  Some at my house, some in his garage.

22    Q.  And --

23    A.  And a lot of them on Amazon warehouse.  We ship

24    them right on in.

25    Q.  So you'd ship them to the Amazon warehouse and

Page 54

1                    TOM K. VANDERBOSCH

2    they would hold them until they were sold?

3         A.  Oh, yeah, that's part of their -- that's part

4    of the Amazon policy if you get them to sell it for you.

5         Q.  So when you say some of it would be stored at

6    your house, would that be in your apartment?

7         A.  Yeah.

8         Q.  And when you say some of it would be stored at

9    Jay's house, was that the one on Merrie Circle?

10        A.  Some of it.

11        Q.  Was some of it stored --

12        A.  Oh, yeah, some of it.

13        Q.  -- at Lorraine's house?

14        A.  Uh-huh.  I remember like stocking up this back

15   room here.

16        Q.  That room right there?

17        A.  No, no, no.  See this door here?

18        Q.  Yes.

19        A.  There's a little statue.  There's like a small

20   back room that's stuffed -- I don't know if it's still

21   stuffed with boxes, but it was at one time.

22        Q.  What type of -- what type of product did -- did

23   you specialize in?

24        A.  Well, Jay had his own thing he was doing, like

25   Amazon videos and whatnot.  Like, Amazon had a policy

1                    TOM K. VANDERBOSCH

2    where if you didn't have a license at a certain time

3    then you couldn't sell videos.  But he was before that

4    policy so he could sell videos.  He did videos a lot.

5         Q.  Like DVDs?

6         A.  Yeah, like Batman and whatnot.  But mostly, I

7    did games, lots of games, like from Best Buy and Toys R

8    Us, but mostly Best Buy.  And, oh, dishes too.

9         Q.  What?

10        A.  Stoneware dishes from Kohl's.

11        Q.  Okay.  What about cell phones?

12        A.  No, I never did cell phones.  I did blenders.

13   Big blenders, like the ones that go for like $300.

14        Q.  The Vitamixes?

15        A.  I don't know if they're called Vitamixes.

16        Q.  Do you know if Jay did cell phones at that

17   time?

18        A.  I'm sure he did like cell phones from different

19   companies, but I don't know for sure.

20        Q.  So he never had you go buy phones for him at

21   that time?

22        A.  Maybe two or three years ago I went to a

23   company, but I don't remember what company it was, it

24   was on like a holiday, like in December or November, he

25   had me and -- Vivian.  Drew's mom, Vivian.

Page 56

1                    TOM K. VANDERBOSCH

2        Q.  Vivian's his mom's name?

3        A.  Yeah, Vivian Powell.

4        Q.  So we have actually a Lorraine who is the owner

5   of this house.  Do you know who a Lorraine is then?

6        A.  That's Jay's mom.  I thought I said that.

7        Q.  So who is Vivian?

8        A.  Vivian is Drew's mom.  Remember I told the

9   story about how I went to Drew's mom's house?  That was

10  Vivian.  I just remembered her name.

11       Q.  Okay.  And do you know what Vivian's last name

12  is?

13       A.  Powell.

14       Q.  Powell.  Okay.

15            So Jay had you and Vivian go purchase

16  phones on a holiday in November or December; is that

17  right?

18       A.  Yeah, like two or three years ago, but it

19  wasn't in conjunction with the Amazon business and

20  whatnot.  It was his own selling because he would just

21  give us -- he would just give us like 5 or $10 per

22  phone.

23       Q.  Was there anyone else besides you and Vivian

24  that he would use to do that?

25       A.  I'm sure all his friends and family.  I mean,

Page 57

1                        TOM K. VANDERBOSCH

2    he went to the store, he got phones for his kids, like

3    five phones per kid, back then they only had two kids.

4         Q.   So -- so --

5         A.   According to his --

6         Q.   -- his three-year-old needed five phones?

7         A.   According to the policy, as long as you have

8    different family members and whatnot.  I'm sure he had

9    his wife do it too.

10        Q.   What was your understanding of -- was it your

11   understanding that he was using all these phones or that

12   he was reselling them?

13        A.   I actually didn't have -- I did not have an

14   understanding of it.

15        Q.   Did you ever see him using any of those phones

16   that you and others purchased for him?

17        A.   Jay, I've seen him with many different phones.

18   Every year he upgrades, so...

19        Q.   Does he usually have one phone at a time?

20        A.   No, no.  Jay has 19 accounts.  Nineteen

21   different active accounts.

22        Q.   How do you know that?

23        A.   Well, because I'm on a grandfather plan with

24   him.  The phone I have is his.  Well, technically, the

25   phone number is his.  I pay him each month and --

Page 64

1                    TOM K. VANDERBOSCH

2        Q.  Okay.

3        A.  In fact, he's up for reelection, and he's one

4    of the deacons at my church, and he's also one of my

5    good friends.  And he -- the store that you don't have a

6    picture of is Ace Hardware.  His family owns that, his

7    parents do technically, but he helps run it.  And he

8    also had that -- his wife had the Go Figure.  It used to

9    be like an exercise place, but now it's more like a -- a

10   politic place, you know --

11       Q.  Okay.

12       A.  -- for like whatnot.

13       Q.  And right next to that is a MetroPCS store.  Do

14   you know the folks that are in there?

15       A.  I've seen the lady.  She comes into Gerald's

16   office -- well, Adrina's office.  She used to come in

17   like two or three times a week to get change.

18       Q.  Have you been in that MetroPCS store?

19       A.  I've been in there twice.

20       Q.  What were you doing there?

21       A.  I was trying to purchase phones during this

22   last holiday for Jay.

23       Q.  When you say "this last holiday," which one?

24   The President's Day that just passed a few weeks ago?

25       A.  No, no, the Christmas holiday.  But they denied

Page 65

1                    TOM K. VANDERBOSCH

2  me both times, and I've never gone back.

3        Q.  What were you trying to buy for Jay?

4        A.  J7s.

5        Q.  How many?

6        A.  I was trying to buy five.

7        Q.  Did they tell you why they turned you away?

8        A.  Yes, they said the phone lines were inactive.

9  I knew they were active because Jay told me they were;

10 so they were just lying to me.  Just like when you-all

11 had somebody come to my door and give me the thing.  You

12 told me -- they told me it J.C. Penney.  They were

13 lying.

14       Q.  So what I don't -- I guess I need to backtrack

15 because you when you say, They told me the lines were

16 inactive, what do you mean?

17       A.  They said the lines were inactive, as in, they

18 wouldn't show up on the thing.

19       Q.  Okay.

20       A.  But they --

21       Q.  So walk me through the whole thing so that I

22 can see the story from your perspective.  So you walk

23 into the store.  Do you have anything with you?  Do you

24 have any phones with you or anything that you're looking

25 to trade in or just your own phone?

Page 66

TOM K. VANDERBOSCH

1

2      A.   Uh-huh.

3      Q.   Okay.  So you walk in --

4      A.   It's not a trade-in thing.  They had a contract

5  thing.  It wasn't even a contract.  It was if you

6  would -- you would go in and you would ask to get the

7  J7, because the J7s came with Amazon Prime, and you get

8  J7s.

9      Q.   So it was a special promotion that you were --

10     A.   Uh-huh.  Uh-huh.

11     Q.   And did you --

12     A.   Sorry, yes, yes.

13     Q.   Let me ask here.

14          Was this a promo that you became aware of

15  or was this something that Jay knew about and told you

16  about?

17     A.   The latter.

18     Q.   So Jay told you, They're having this special, I

19  want you to go in and get some of these phones?

20     A.   Yes.

21     Q.   Okay.  And so you walk up to the counter, and

22  you know they're running this special, and you say you

23  want these J7s, and you want five of them, correct?

24     A.   And I told them I have five lines.

25     Q.   Okay.  So -- because these were port-ins,

1                    TOM K. VANDERBOSCH

2     right, you're porting in a number?  Is that what you

3     were doing?

4          A.  I don't know.

5          Q.  Okay.  Do you know what it means to port-in a

6     number?

7          A.  No.

8          Q.  Okay.

9               Had Jay provided you with five cell phone

10    numbers when you went in there?

11         A.  He told me he purchased them from a place and

12    gave me the numbers.

13         Q.  So he did.  He gave you five --

14         A.  Yes.

15         Q.  -- different cell phone numbers?

16         A.  Yes.  And they were all on one account.

17         Q.  And do you know what account they were on?

18    What carrier were they on, do you know?

19         A.  No, it was some -- I knew back then because he

20    told me, you know, what to say, but I don't know now

21    because I plum forgot.

22         Q.  Have you -- could it have been Ting?

23         A.  Yeah, Ting.

24         Q.  Okay.

25               So he gave you five numbers on a Ting

Page 68

TOM K. VANDERBOSCH

account and said go in and tell them you want the --

A.  Sorry.  Yes, Ting.  Yeah.

Q.  -- that you want five J7s --

A.  Uh-huh.

Q.  -- and the Amazon Prime deal?

A.  Actually, I told them -- I told them if they
don't have J7s, I would take something else, but I can't
think of what that other phone on the deal was.  But it
was -- supposedly, they had just upgraded -- upgraded
their camera, so it was a pretty good buy, but not as
good as with the Amazon deal.

Q.  So what was -- what was your intention as far
as -- what was the purpose of trying to get these five
phones, were you planning on using them?

A.  No.

Q.  What were you going to do with them?

A.  Give them to Jay.

Q.  What was Jay going to do with them?

A.  He was going to let them sit there for three
months; when they became un-IDed, he would transfer
them.  You know, offer to sell them, I guess.

Q.  Do you know where Jay sells those types of
products?  Is it on his Amazon -- or the Amazon portal,
the store that you had?

Page 69

TOM K. VANDERBOSCH

1

2    A.  It wasn't with our business.

3    Q.  Do you know if he has another business?

4    A.  I think he does, but I don't know the

5    information.  I also know he had an Ebay account, but he

6    told me he doesn't like Ebay because Ebay is more geared

7    towards the buyer compared to giving the seller

8    protection.  But I don't know which one that is either.

9    Q.  I think you testified earlier that you do a

10   little shopping on Ebay; is that right?

11   A.  I do occasionally, yeah.

12   Q.  Do you also have -- do you do any selling on

13   Ebay?

14   A.  I did years ago.  I don't know how many years

15   ago, but I did years ago.  Mostly, it was games I didn't

16   play anymore.  I'd sell them back, you know.

17   Q.  So used games?

18   A.  Yeah.

19   Q.  So you've never been on --

20   A.  Sorry.  Yes.

21   Q.  Have you ever seen any of the sites on Ebay

22   where Jay is selling anything?

23   A.  I haven't.

24   Q.  What was -- what were you supposed to get out

25   of these cell phone transactions that you were doing for

Page 70

1                    TOM K. VANDERBOSCH

2    Metro for Jay?

3         A.  He would give me $5 per phone, and if I got

4    over a hundred, $10 per phone.

5         Q.  And what happened with the Amazon Prime deal,

6    what -- would you use that or is that something --

7         A.  He actually did give me five years.

8         Q.  Okay.  So --

9         A.  So I have five years of Amazon Prime, which is

10   pretty awesome.

11        Q.  What was -- what was your understanding about

12   what the deal was that you were trying to get?  What did

13   you -- when you went in there and you had your five

14   phone numbers and --

15        A.  I would pick up five J7s, it would come with

16   Amazon Prime, and I would use Jay's credit card.

17        Q.  How much -- how long a period -- was it free

18   Amazon Prime, was that it?

19        A.  Free Amazon, and you had to sign up for one

20   month.

21        Q.  And so you signed up for one month --

22        A.  And you got a free phone and free Amazon Prime

23   phone.

24        Q.  Okay.

25                    So you had to sign up for a Metro plan --

Page 71

1                       TOM K. VANDERBOSCH

2        A.   For one month.

3        Q.   -- and then the -- and then you would get a

4   free phone and free year of Amazon Prime; is that right?

5        A.   That's correct.  And he paid for each one of

6   those months in advance.

7        Q.   Okay.

8        A.   Which is a pretty awesome deal.

9        Q.   Did you read the terms and the conditions for

10  that plan when you purchased those -- when you went to

11  purchase the phones?

12       A.   You didn't have to.  They didn't even -- didn't

13  even offer.

14       Q.   When you got your phone, did it come in a box?

15       A.   Did this one come in a box?

16       Q.   Yes.

17       A.   I think it did, yes.

18       Q.   And when you took it out of the box, did you

19  see the paper with the tiny writing on it that said

20  terms and conditions?

21       A.   Actually, I need to go back.  I didn't get it

22  out of the box.  I bought the phone, I took it to Jay

23  and Jay unboxed it for me.  He even transferred the

24  numbers from my old phone over to this phone and then a

25  couple days later he gave me the phone, Here you go.  I

Page 72

1                    TOM K. VANDERBOSCH

2   said, Thanks, Jay.

3        Q.  How -- how long have you had that phone?

4        A.  This one?  I'm not sure.  Somewhere between one

5   and two years, but I've had it for over a year for sure,

6   but I'm not sure -- it could be two years.  Somewhere

7   around there.  I'm sorry.

8        Q.  So was the entire plan for and the explanation

9   for what you were going to be doing in this Metro store,

10  was that provided to you by Jay?

11       A.  Yeah.  Sorry, yes.

12       Q.  You didn't freelance at all?  There wasn't any

13  part of this that was your own idea; is that right?

14       A.  No.

15       Q.  Okay.  Did Jay tell you which plan you should

16  pick when you were purchasing the phones?

17       A.  Yes, he did.  He told me I should go for a

18  certain plan, and the plan was like 33 a month or 32 a

19  month, and it was for a one month thing only.  He told

20  me that, Don't let them try to get me to get extras

21  because they'll just try to add stuff on to make extra

22  money.

23       Q.  It was your understanding that he wasn't

24  intending to use these phones anyway, correct?

25       A.  He told me he would -- he would -- he would

Page 73

1                          TOM K. VANDERBOSCH

2      follow the legal guidelines, and let them sit for like

3      three months until they were no longer with any certain

4      company, and then he would get rid of them.

5           Q.  Okay.  But this came from Jay, you didn't do

6      any independent research --

7           A.  I did not, no.

8           Q.  -- to confirm any of the things he said?

9           A.  No, I did not.

10          Q.  Okay.

11          A.  This is all from Jay.

12          Q.  Okay.  All right.

13               Let's take a look at the last two pictures

14     and then we're going to take quick bathroom break.

15          A.  All right.  I don't need to use the restroom.

16          Q.  I do.

17          A.  All right.

18          Q.  So we have two pictures here of a ████████████

19     ██████.  Do you recognize that vehicle?

20          A.  It looks like it could be mine, ████████████

21     ████████████████████████████████████████████████████

22     ████████████████████████████████████████████

23     ██████████████████████ --

24          Q.  Okay.  Well --

25          A.  -- so I could recognize it.

Page 96

TOM K. VANDERBOSCH

1

2          A.  No.

3          Q.  Were you ever present when he was making a deal

4     to resell any of the phones that you had obtained for

5     him?

6          A.  No.

7          Q.  Do you know who he sold them to?

8          A.  People online.

9          Q.  Did he ever have you meet with anyone to

10    purchase a phone for him?

11         A.  No.

12         Q.  Do you know if he ever met with anyone to

13    purchase a phone?

14         A.  I'm pretty sure they were all mail-outs, like

15    people -- he mentioned that with one phone deal there

16    were people in Canada, because people in Canada couldn't

17    get a certain type of phone, so he sold a whole bunch of

18    the phones to somebody in Canada or people in Canada.

19    But he actually never mentioned names of people and he

20    never let me in on it, you know, watching him do that.

21         Q.  Do you know what kind of phones he was selling

22    in Canada?

23         A.  I don't know.

24         Q.  Do you know what happened to the J7s that --

25    the Metro J7s that were acquired in December?

Page 99

1                        TOM K. VANDERBOSCH

2   me.

3       Q.   Do you know how he got them from Ting?

4       A.   I don't have a clue.

5       Q.   How many of the stores that you went to turned

6   you away when you were attempting to make purchases with

7   the Amazon Prime deal?

8       A.   I'm not sure.

9       Q.   Was it just the one that we talked about or

10  were there others?

11      A.   No, no.  Tons of them turned me away --

12      Q.   Okay.

13      A.   -- for various separate reasons.  Which some of

14  them said the phone numbers weren't working, some said

15  we don't have any phones or we don't have enough phones,

16  and some -- they all gave different reasons.  And some,

17  when they found out, oh, you have to buy accessories or

18  insurance.  I said, No, we won't do it.

19      Q.   Did Jay tell you any specific stores that he

20  wanted you to go to?

21      A.   He told me to go to all the ones I could.

22      Q.   But he didn't identify a specific store and

23  say --

24      A.   He did not, no.

25      Q.   Oh, wait.  Let me finish.

Page 100

1                    TOM K. VANDERBOSCH

2        A.  Go ahead, I'm sorry.

3        Q.  And say, Tom, I want you to try this store,

4   this store, and this store?

5        A.  No.  He did -- when I mentioned some stores

6   turned me away and I was getting frustrated, he said,

7   Tom, I went to stores in this area and they worked good

8   for me.  But he didn't say, Tom, go to those stores.  He

9   just said, I had good experience in these stores.  He

10  suggested that I should go, but.

11       Q.  Did you go?

12       A.  I actually went to a couple stores, but if I

13  had a bad experience, I left.

14       Q.  So some of the stores that he had been

15  successful at turned you away?

16       A.  That's correct.  Or at least -- yeah.

17       Q.  At least he told you he had been successful

18  there?

19       A.  Yes.  ████████████████████████████████

20  ███████████████████████████████████████████████████████

21  ████████████████████████████████████████████

22       Q.  Was that -- was that the end of it for you?

23       A.  That was near the end of it.  And then a couple

24  days later I went roller skating ███████████████████████

25  ██████████████████████    ███████████████████████████████

Page 101

1                         TOM K. VANDERBOSCH

2    ███████████████████████████████████████████████████

3    ██████████████████████████████████   ██████████████

4    Jay, I'm probably not going to do this anymore.  He

5    said, Well, Tom, if you go in, you might get sympathy.

6         Q.  Oh, God.

7         A.  But after that, I just didn't do it because I

8    was in a lot of pain, █████████████████████████████

9    ████████████████████████████████████████   And I

10   pretty much didn't do it after that.

11        Q.  Did Jay try to push you to continue?

12        A.  No, no.  Jay knows me ██████████████████████

13   █████████████████.  He understand.  He -- when he first told

14   me about the deal, when he told me it was $10 a phone,

15   and I'll get to that in a second, I didn't do anything

16   for a week and a half.  And so then he said, Okay, Tom,

17   I'll do $5 a phone and if you get over a hundred, I'll

18   give you $10 a phone, and he explained to me how much

19   money I could make.  █████████████████████████████

20   ████████████████████████████████████████████████████

21   ██████████████████.  But he convinced me and so I worked

22   hard and...

23        Q.  How many phones did you end up doing?

24        A.  140.  Either 140 or 145, but he said that like

25   10 or 15 of them, the people just boxed them up and they

Page 102

1                    TOM K. VANDERBOSCH

2  didn't get fully activated, so they were worthless.  I

3  don't --

4        Q.  So he didn't pay you for all 145?

5        A.  No, he did.

6        Q.  So he paid you for -- he paid you $10 apiece

7  for approximately 145 phones?

8        A.  140, I think.

9        Q.  Okay.  When you would leave a store with

10  phones, would you immediately go and give them to Jay or

11  would you wait until you had accumulated some and then

12  go give them to Jay?

13        A.  I'd put them in my trunk, and after I had so

14  many, I'd give them to Jay, or when I saw him next.

15        Q.  How often do you see Jay?

16        A.  It depends.  Sometime I see him every week.

17  Sometimes I see him two or three times a week.

18  Sometimes I don't see him for a whole month.  During the

19  phone deal, I saw him like every three or four days.

20        Q.  So once you would see him every three of four

21  days, you would give him whatever phones you had

22  accumulated?

23        A.  I don't think I did.  I think I gave him

24  like -- I think the first batch I gave him like 30 -- 20

25  or 30 or so, and the next batch I gave him a whole

Page 103

1                    TOM K. VANDERBOSCH

2   hundred or so.  So I don't think it was like, you know,

3   meeting four or five times.  It was just like two

4   different -- two different times he came by my apartment

5   and picked them up.

6        Q.  Okay.  So he would come to you to get them?

7        A.  Yeah.

8        Q.  What kind of car does Jay drive?

9        A.  I think it's a minivan.

10       Q.  So he has lots of room to put as much in there

11   as you have?

12       A.  Well, not a lot, but -- sometimes he's had to

13   like remove boxes to -- I guess so, yes.

14       Q.  Okay.

15       A.  But he has his kids in there with him at all

16   times, too.  Remember, he's a at-home dad.  So he's got

17   three kids in the backseat as well.  And so he didn't

18   have as much room as you might think.

19       Q.  So when you would give him the phones, would he

20   pay you then and there, or would he wait until after you

21   were done and then pay you for all?

22       A.  Actually, when I delivered the last set of

23   phones, he said, Well, how much do you need?  I told him

24   I need a certain amount in cash.  I was building like a

25   chess table for some friends for Christmas and I need to

Page 118

1                     TOM K. VANDERBOSCH

2        Q.  So does she work a lot?

3        A.  She works from like 8:00 or 9:00 in the morning

4   until 5:00 in the evening and then she comes home.  And

5   Jay is taking care of the kids all day long and driving

6   to school and, you know.

7        Q.  Does Jay do the rest of the house activities?

8   Does he cook dinner, does he clean, that kind of thing?

9        A.  He does clean to some extent.  Though their

10  house is a hoarder's mess, though.  Take that with a

11  grain of salt.

12       Q.  Is she a hoarder, as well, his wife?

13       A.  I don't think so but I don't know enough.  I

14  don't have a -- we're friends, but not a friendship

15  relationship.

16       Q.  This is his wife?

17       A.  Yes.

18       Q.  What's her name?

19       A.  Amy.

20       Q.  Does Amy work at all with Jay in his business?

21       A.  I don't believe so.

22       Q.  So it's your -- it's your belief that they're

23  able to take these vacations on the salary that she

24  earns?

25       A.  Well, no, he also buys and sells stuff online,

1                    TOM K. VANDERBOSCH

2    but I really don't keep track of that.  I know that, you

3    know, he doesn't have a lot of time.  So while he's

4    taking care of the kids all day, he doesn't do any

5    buying and selling except in store in person.  The

6    selling he does is at night after his wife and kids have

7    gone to bed.

8         Q.  Okay.

9              Do you know if any of these trips that he

10   takes are for business or are they all pleasure?

11        A.  Oh, they're all pleasure.

12        Q.  Okay.

13        A.  I mean, like South America, and you know --

14   they like went to the churrascaria.  He bragged about

15   the steaks at a Brazilian steakhouse, you know.

16              I mean, he's offered to take me on one or

17   two of these trips and pay for everything, and I've

18   denied it.  I hate airports and the privacy that they

19   take away from you with the scan, so I refuse to do

20   airports.  I said, No, thanks.  So I don't do -- but,

21   you know, he doesn't have a problem with that.

22              (Exhibit Number 5 marked.)

23        Q.  Okay.  So I'm going to show you what we've

24   marked as Plaintiff's Exhibit 5, and I'm going to tell

25   you that this is a spreadsheet that was created by

Page 144

                    TOM K. VANDERBOSCH

1

2    Q.  No, no, I appreciate that.

3          Are you -- other than the financial

4    overlaps that we've talked about here today between you

5    and Jay, the American Express card, his access to your

6    banking, or at least one of your bank accounts, the

7    PayPal account, are there any other overlaps financially

8    between you and Jay?

9    A.  I don't know if he still does, but he had, you

10   know, utilities in my name at his location.  I don't

11   know if he still does or not, but he did.

12   Q.  Does Jay only own the one house?

13   A.  I don't know.

14   Q.  Has he ever had a commercial space, that you

15   know of?

16   A.  No.  I believe he uses his mother's commercial

17   space.

18   Q.  Where is that located?

19   A.  I don't know.  Somewhere in Dallas near --

20   somewhere near his mom's house.

21   Q.  Do you know --

22   A.  It's a real estate place but I don't know what

23   it's called or what its address is.

24   Q.  So when you say it's a real estate place, is

25   she a real estate agent?

Page 145

1                    TOM K. VANDERBOSCH

2       A.  Oh, yes, she is.

3       Q.  Okay.  So this is her office, her real estate

4  office; is that right?

5       A.  I believe so.

6       Q.  Okay.

7            Any other commercial space that you know of

8  that Jay has or uses?

9       A.  I know he stores stuff in, you know, his mom's

10  place, and at his place, and I have some, you know,

11  games and plates.  I got a lot of dishes.  A lot of them

12  broke and I got to take them back and get them replaced.

13  Let me think.  Those are all I can recall.

14       Q.  Has he ever had you sign as a guarantor?  Do

15  you know what a guarantor is?

16       A.  Like somebody who cosigns like for a -- like

17  for a student loan or something like that.

18       Q.  Yeah, or a car loan or some sort of loan.  Has

19  he ever had you sign as a guarantor on a loan?

20       A.  I don't believe so.

21            My mom cosigned for me when back when I was

22  going, you know, to, you know, tech school when I signed

23  up for it.  So I kind of know what it is, but pretty

24  sure he hasn't.

25       Q.  So you testified earlier on today that before

Page 152

TOM K. VANDERBOSCH

1    account?

3        A.  What's that?

4        Q.  Okay.  I'm going to take that as a no.  It's

5    another social media site --

6        A.  Okay.

7        Q.  -- but it's a business site.

8        A.  No.

9        Q.  Okay.  Any other online sites that we haven't

10   talked about today that you used to buy or sell any

11   products?

12       A.  The only ones I use to buy and sell products

13   online is Target, Best Buy, those a lot, Kohl's, but I

14   haven't done Kohl's in quite a while, over a year and a

15   half, but Target and Best Buy, I've done in the last

16   couple months, mostly game-type stuff for Jay or game

17   systems.  Oh, I love games.  Sorry.

18       Q.  Any phones?

19       A.  I don't think so.  He's mentioned that I should

20   try to buy phones online, but when he mentions them, I'm

21   usually not at home.  I'm like visiting Adrina and so I

22   could use my phone app.  And I have really big fingers,

23   so it's really hard to type stuff on my phone app, and

24   so I just don't do it and when I get home I've already

25   forgotten.

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| METROPCS, a brand of T-MOBILE USA, Inc., a Delaware Corporation, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No: 2:17-cv-04557-MMB |
| | ) |
| ISAIAH MICHAEL THOMAS, et al, | ) |
| Defendants. | ) |

## PLAINTIFF'S SUBPOENA DUCES TECUM TO PRODUCE DOCUMENTS
## AND TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:     **Lorraine R. Frazin**
        **6930 Elmridge Drive**
        **Dallas, Texas 75240**

☒   *Testimony*: **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.

| Place: | Date and Time: |
|---|---|
| GRAY REED & McGRAW, P.C. c/o April R. Terry | |
| 1601 Elm Street, Suite 4600 | **April 19, 2018 at 9:00 a.m.** |
| Dallas, Texas 75201 | |
| **QUESTIONS:** | |
| **Amanda Jesteadt, Carlton Fields (561) 650-0354** | |

The deposition will be recorded by this method: <u>oral examination to be transcribed by a court reporter.</u>

☒   *Documents*: **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

### SEE "EXHIBIT A" FOR DOCUMENTS THAT MUST BE PRODUCED

| Place: | Date: |
|---|---|
| GRAY REED & McGRAW, P.C. c/o April R. Terry | |
| 1601 Elm Street, Suite 4600 | **April 19, 2018 at 9:00 a.m.** |
| Dallas, Texas 75201 | |
| **QUESTIONS:** | |
| **Amanda Jesteadt, Carlton Fields (561) 650-0354** | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: <u>March 30, 2018</u>

CLERK OF COURT                                    OR

_____                _____
*Signature of Clerk or Deputy Clerk*              *Attorney Signature*

The name, address, e-mail, and telephone number of the attorney representing **Plaintiff** who issues or requests this subpoena is: **Jennifer . Yasko, Email:** **jyasko@carltonfields.com, CARLTON FIELDS JORDEN BURT, P.A., 525 Okeechobee Blvd., Suite 1200, West Palm Beach, FL 33401; Tel: 561-659-7070.**

114156649.1

Civil Action No: 2:17-cv-04557-MMB
Eastern District of Pennsylvania

# PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

This subpoena for (name of individual and title, if any)_____.
was received by me on (date)_____.

☐ I served the subpoena by delivering a copy to the named individual as follows:_____
_____

_____on (*date*)_____; or

☐ I returned the subpoena unexecuted because:_____
_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

My fees are $_____for travel and $_____for services, for a total of $_____.

I declare under penalty of perjury that this information is true.

Date:_____        _____
                                                     *Server's Signature*

                                    _____
                                                     *Printed name and title*

                                    _____
                                                     *Server's address*

Additional information regarding attempted service, etc.

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**
**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
  **(i)** is a party or a party's officer; or
  **(ii)** is commanded to attend a trial and would not incur substantial expense.
**(2)** *For Other Discovery.* A subpoena may command:
 **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 **(B)** inspection of premises at the premises to be inspected.
**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.
**(2)** *Command to Produce Materials or Permit Inspection.*
 **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested.
The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
**(3)** *Quashing or Modifying a Subpoena.*
 **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  **(i)** fails to allow a reasonable time to comply;
  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  **(iv)** subjects a person to undue burden.
 **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

 **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  **(ii)** ensures that the subpoenaed person will be reasonably compensated.
**(e) Duties in Responding to a Subpoena.**
**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
 **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
 **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
**(2)** *Claiming Privilege or Protection.*
 **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  **(i)** expressly make the claim; and
  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

114156649.1

# EXHIBIT A

## DEFINITIONS AND INSTRUCTIONS

Except as defined below, all words used in these requests for production shall be construed according to their ordinary accepted meanings, unless some other meaning is clear from the context.

1.      "You" and "Your" shall mean and include Lorraine R. Frazin and each of her employees, accountants, agents, attorneys, representatives, investigators, consultants, partners or other persons or entities acting or purporting to act for her or on her behalf, and any corporation, partnership, proprietorship, doing business as name, trade name, or entity of any type in which she has an interest or that she is in any way affiliated or associated with, and any parent, subsidiary, affiliate, licensee, franchisee, sister corporation or predecessor of same.

2.      "Defendants" shall mean and include Isaiah Michael Thomas, individually and d/b/a Go Phonez, Zamir Jefferson, Christopher Alexander T. Johnson, Brion R. Benson, Rolan Stephens, Keosha Lawson, and Nina Stewart and each and all of Defendants' past and present companies, agents, employees, heirs, personal representatives, beneficiaries, and all other persons or entities acting or purporting to act for Defendants or on Defendants' behalf, including, but not limited to, any corporation, partnership, association, proprietorship or entity of any type that is in any way affiliated or associated with Defendants or one of Defendant's representatives, agents, assigns, employees, servants, affiliated entities, and any and all persons and entities in active concert and participation with Defendants.

3.      "Document" or "documentation" shall mean each and every written, recorded, or graphic matter of any kind, type, nature, or description that is in your possession, custody, or control or of which you have knowledge, including but not limited to correspondence, memoranda, tapes, or handwritten notes, written forms of any kind, charts, drawings, sketches, graphs, plans, articles, specifications, diaries, letters, photographs, minutes, contracts, agreements, reports, surveys, computer printouts, data compilations of any kind, facsimiles, email messages, text messages, spreadsheets, invoices, order forms, checks, drafts, statements, credit memos, reports, summaries, books, ledgers, notebooks, schedules, recordings, catalogs, advertisements, promotional materials, films, video tapes, audio tapes, brochures, or pamphlets, or any written or recorded materials of any other kind, however stored, recorded, produced, or reproduced, and also including, but not limited to, drafts or copies of any of the foregoing that contain any notes, comments, or markings of any kind not found on the original documents or are otherwise not identical to the original documents, as well as any affidavits, statements, summaries, opinions, reports, studies, analyses, computer print-outs, data processing input/output, website screen shots, databases, electronic code, e-mails and all other records kept by electronic means, photographic or mechanical means, and other things similar to any of the foregoing.

4.      To "identify" a document means to provide the following information irrespective of whether the document is deemed privileged or subject to any claim of privilege:
        a.      the title or other means of identification of the document;
        b.      the date of the document;
        c.      the author of the document;

1

      d.      the recipient or recipients of the document;

      e.      the subject matter of the document;

      f.      the present location of any and all copies of the document; and

      g.      the names and current addresses of any and all persons who have possession, custody or control of the document or copies thereof.

5.      "Person" means natural persons, individuals, firms, corporations, partnerships, proprietorships, joint ventures, unincorporated associations, government agencies, and all other organizations or entities of any type.

6.      To "identify" a person means to state the person's full name, present or last known address and telephone number, and present or last known business affiliation and title.

7.      The phrase "contact or communication" includes all instances in which information has been transmitted from one person or entity to another, including, but not limited to, telephone conversations, meetings, conferences, correspondence, other mailings, facsimiles, email, or other data transmissions of any type or nature, whether oral, electronic, or written.

8.      To "identify" a contact or communication means to state the date of the contact or communication, the person or persons involved in, participating in, or present at the contact or communication, and the nature or type of the contact or communication.

9.      The term "entity" means corporations, companies, businesses, partnerships, proprietorships, or fictitious or trade names.

10.      The singular and masculine form of any word shall embrace, and shall be read and applied as embracing, the plural, the feminine, and the neuter.

11.      The use of a verb in any tense shall be construed as the use of the verb in all other tenses, wherever necessary to bring within the scope of the request for production all responses which might otherwise be construed to be outside the scope.

12.      The term "each" includes the word "every" and "every" includes the word "each." The term "any" includes the word "all" and "all" includes the word "any." The terms "and" as well as "or" shall be construed either disjunctively or conjunctively so as to bring within the scope of the request for production responses which might otherwise be construed to be outside the scope.

13.      "Customers" includes, but is not limited to, all individuals, companies, entities, resellers or third parties to whom you (or any other entity that you are affiliated with) have sold Products and/or information.

14.      "Product(s)" means any product, good, or service manufactured, distributed, sold, or offered for sale by T-Mobile USA, Inc. under any of its brands, including MetroPCS, as well as any instance where there is no express identification that the product, good or service is affiliated with another wireless carrier (*e.g.*, Sprint, AT&T or Verizon), including but not limited

to Handsets and Activation Materials, and expressly including any and all confidential activation codes.

15.    "Handset(s)" means any phone or handset manufactured, distributed, sold, or offered for sale by T-Mobile USA, Inc. under any of its brands, including MetroPCS, as well as any instance where there is no express identification that the product, good or service is affiliated with another wireless carrier (*e.g.*, Sprint, AT&T or Verizon), either in their original condition or after having been reprogrammed or otherwise altered or tampered with.

16.    "Activation Materials" shall mean any SIM Cards, PIN numbers, codes, and/or other mechanism, process, instructions or materials used to activate service or acquire airtime in connection with a new activation.

17.    "Alter," "alteration," or "altering" means to modify, unlock, reprogram or change in any way, or to attempt to modify, unlock, reprogram or change in any way, any Handset.

18.    The term "relating to" shall be construed as to include indicating, referring to, mentioning, reflecting, pertaining to, evidencing, involving, describing, discussing, supporting, or contradicting.

## TIME FRAME

Unless otherwise indicated, these requests for production cover the time period from October 12, 2012 up to and including the date of your response hereto.

## DOCUMENTS TO BE PRODUCED

1.    All documents relating to the Defendants.

2.    All documents reflecting, referencing or related to transactions between you and Defendants including, but not limited to, purchase orders, receipts, sales orders, invoices, shipping records, statements, and communications.

3.    All documents reflecting, referencing or related to your acquisition and/or sale of any Products.

4.    All purchase orders, receipts, sales orders, invoices, statements, shipping records, communications, and other documents evidencing or relating to your purchase, advertisement, and/or sale of Products.

5.    All purchase orders, receipts, sales orders, invoices, statements, communications, and other documents evidencing or relating to your purchase and/or sale of Products from or to the Defendants.

6.    All documents constituting, referencing or related to any emails and/or communications between you and any of the Defendants.

7.      All documents, including but not limited to, communications and e-mail correspondence, relating to, showing, discussing or evidencing the alteration of any Products (*e.g.,* unlocking, unpackaging, flashing, repackaging).

8.      All of your general ledgers, check registers, accounts, books of account, financial statements, canceled checks, electronic or credit card charge receipts and similar accounting/bookkeeping records that reference or reflect, either expressly or otherwise, finances or transactions relating to any of the Defendants.

9.      All documents that you received, requested, accessed, or to which you were provided access reflecting Defendants' solicitation, advertising, purchasing, and selling of any Products (*e.g.,* emails, ads, email blasts, webpages).

10.      All documents relating to any investigation conducted by a state or federal law enforcement agency, customs agency, or other state or federal investigative agency or department, relating to you purchasing, selling, altering, shipping, or advertising any Handset.

11.      All documents and correspondence related to your involvement in any lawsuit involving the purchasing, selling, altering, shipping, or advertising any Products or services.

4

114156649.1

091

# EXHIBIT 3

# GARY N. SCHEPPS

### ATTORNEY & COUNSELOR

DRAWER 670804
DALLAS, TEXAS 75367

TELEPHONE   972-200-0000
FACSIMILE    972-200-0535

April 10, 2018

Via Email: jyasko@carltonfields.com
Jennifer Yasko
Carlton Fields Jorden Burt
525 Okeechobee Blvd., Suite 1200
West Palm Beach, FL 33401

**RE: March 30, 2018 Subpoena served on Lorraine R. Frazin in Pennsylvania Civil Action No: 2:17-cv-04557**

Jennifer,

As you are aware, I represent Mrs. Frazin with respect to the Subpoena you issued and had served on her.

When I called to inquire about your basis for asserting that Mrs. Frazin may have knowledge about the disputed claims in your Pennsylvania suit, I was referred to Stacey K. Sutton.  Having now spoken to Ms. Sutton, I am still in the dark about your basis for asserting that Mrs. Frazin has knowledge relevant to your claims in Pennsylvania.

Clearly, your client is unhappy that Tom Vanderbosch availed himself to your client's offer of 4 "free phones" with each account ported to your client.  However, Ms. Sutton offered nothing which related Mr. Vanderbosch's purchases to the claims you have asserted against the defendants in Pennsylvania.

If you have an articulable basis for claiming that Mrs. Frazin has personal knowledge that is relevant to your claims in Pennsylvania, please let me know immediately.

I hope we can work by agreement.  If helpful, Mrs. Frazin can provide a declaration under oath that she knows nothing about any of the defendants in the Pennsylvania suit or the claims in that suit.

093

Jennifer Yasko
Carlton Fields Jorden Burt
April 10, 2018
Page 2
_____

     Outside of the Pennsylvania suit, I have looked at your client's advertisements for "free phones" and they indicate that four free phones will be provided per account and require only a one month service obligation.   I do not represent Mr. Frazin in this matter but have reached out to him to see if I can help facilitate a resolution.  If you are interested in resolving any dispute you have with Mr. Frazin, I am more than willing to act as an intermediary to help all sides reach an amicable resolution.   Harassing his mother is not the appropriate approach.

     Yours Truly,

Gary N. Schepps
Counsel for Lorraine Frazin

# EXHIBIT 4



**ATTORNEYS AT LAW**

**CityPlace Tower**
525 Okeechobee Boulevard | Suite 1200
West Palm Beach, Florida 33401-6350
P.O. Box 150 | West Palm Beach, Florida 33402-0150
561.659.7070 | fax 561.659.7368
www.carltonfields.com

Stacey K. Sutton
Attorney
561.650.0334 Direct Dial
ssutton@carltonfields.com

April 16, 2018

Atlanta
Hartford
Los Angeles
Miami
New York
Orlando
Tallahassee
Tampa
Washington, DC
**West Palm Beach**

Gary N. Schepps, Attorney
Drawer 670804
Dallas, TX 75367

Via US Mail & Email
Email: legal@schepps.net

     Re:    *MetroPCS v. Thomas, et al.*, Case No. 2:17-cv-04557

Dear Mr. Schepps:

In response to your letter dated April 10, 2018, please be advised that MetroPCS intends to proceed with the deposition of Lorraine Frazin on Thursday, May 19th, as noticed in the duly served subpoena *duces tecum*. If that date is a conflict for you, please let us know immediately, as we can move the depo to either Wednesday, April 18th in the afternoon or Friday, April 20th in the morning. As I indicated to you in our discussion, we have witness testimony from a co-conspirator that Lorraine Frazin and her son, Jason Frazin, both of whom you have represented in the past, are engaged in a broad scheme to defraud MetroPCS using the identical activities described in the complaint.

In fact, just based on what we know already, well over a hundred new MetroPCS phones were obtained by or at the express direction of your clients, including instructions on the models and number of phones to obtain, stores to hit, and even language used to defraud MetroPCS—identical to the scheme perpetrated by Defendants in this case. Further, as you know from our conversation, MetroPCS has testimony that those phones, and potentially others, were being stored at Ms. Frazin's house and some of those phones are believed to still be in her house (her backroom, to be exact). Ms. Frazin is a participant in the scheme to obtain new MetroPCS phones solely for resale online and elsewhere, to co-conspirators such as Defendants, the majority of which ultimately end up unlocked and overseas. Notably, most of the new MetroPCS phones obtained by the Frazins were promptly disconnected from service (some within hours) and disappeared.

Not surprisingly, we disagree with your position regarding the legality of the activities in which your clients are engaged. Courts around the country have found that the clandestine activities engaged in by your clients—using fraud and deception to obtain as many brand new subsidized MetroPCS phones as possible for resale—are a violation of MetroPCS' rights and cause significant damage.

Carlton Fields Jorden Burt, P.A.

114429086.1 Carlton Fields Jorden Burt, P.A. practices law in California through Carlton Fields Jorden Burt, LLP.

Gary N. Schepps, Attorney
April 16, 2018
Page 2

I include Jason Frazin in the definition of "your clients" based on the final paragraph of your letter.  Given your long-standing representation of the Frazin family, you are likely aware that Jason Frazin actively attempted to avoid service of a deposition subpoena for several weeks—making it clear, even in a phone conversation with investigators, that he was affirmatively attempting to avoid service.  Despite Mr. Frazin's efforts, MetroPCS was ultimately able to get service in accordance with Texas Rule of Civil Procedure 106, and intends to go forward with his deposition on Thursday, as well.

While MetroPCS is always amenable to resolving disputes without the need to take further legal action, putting a halt to fraud is a priority for the company and any such resolution would require, *inter alia*, full cooperation and agreement to immediately and permanently cease their activities targeting any and all T-Mobile products and a negotiated settlement amount for damages.  Please contact me if you wish to discuss further.

Sincerely,

Carlton Fields

Stacey K. Sutton

114429086.1

097

# EXHIBIT 5

| From: | Gary Schepps |
|---|---|
| To: | Yasko, Jennifer |
| Cc: | DeMar, Kathleen |
| Subject: | Re: Frazin v. T-Mobile USA, Inc., TXND Case 3:18-mc-00029-K (MetroPCS v Thomas, et al., Case No. 2:17-cv-04557) |
| Date: | Wednesday, April 18, 2018 6:50:25 PM |

Jennifer,

You have been been served by the Clerk with a copy of our motion to Quash and for Sanctions, and, accordingly, Mrs. Frazin will not be attending the noticed deposition of April 19, 2018.

As you are asking Mrs. Frazin to search for documents that you have no need for in your Pennsylvania suit, objection is made that your subpoena is unreasonable and unduly burdensome and, additionally, to the extent, if any, that you are requesting production of documents not relevant to the defendants in the Pennsylvania case, objection is made to your request as being outside the scope of permissive discovery.

Subject to the forgoing objections, please let me be clear that **Mrs. Frazin has no documents responsive to your subpoena request**.

Your truly,

Gary Schepps

Prior thread:

The attached letter is being forwarded to you on behalf of Stacey K. Sutton.



**Kathleen DeMar**

Respectfully submitted, May 3, 2018.

By:  _/s/ Stacey K. Sutton_____
April R. Terry
Attorney-in-Charge
Federal Bar No. 24205
SBT:  00794248
Email:  aterry@grayreed.com
Gray Reed & McGraw, P.C.
1601 Elm Street, Suite 4600
Dalls, Texas 75201
Tel:  (469) 320-6130
Fax: (469) 320-6828

James B. Baldinger (*admitted in the Northern District of Texas*)
Florida Bar No. 869899
Email:  jbaldinger@carltonfields.com
Stacey K. Sutton (*pro hac vice pending*)
Florida Bar No. 270334
Email: ssutton@carltonfields.com
**CARLTON FIELDS JORDEN BURT, P.A.**
525 Okeechobee Boulevard, Suite 1200
West Palm Beach, Florida  33401
Tel: (561) 659-7070
Fax: (561) 659-7368

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this day a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF, which will send notification to the registered attorney(s) of record that the documents have been filed and are available for viewing and downloading.

Dated: May 3, 2018

/s/ Stacey K. Sutton_____
Stacey K. Sutton